UNITED STATES of America,
Plaintiff-Appellee,

v.

Leslie Edward WILLIAMS, Joseph Anthony Butera and Salvadore Joseph Ferino, Defendants-Appellants.

No. 26460.

United States Court of Appeals
Fifth Circuit.

Sept. 17, 1969.
Rehearing Denied Oct. 28, 1969.

Billy J. Jordan, Columbus, Miss., for Williams.

Joseph Anthony Butera, pro se.

Arthur Parker, Birmingham, Ala., for Butera.

H. Ralph Bolen, Birmingham, Ala., Houston & Chamberlin, D. W. Houston, Jr., Claude A. Chamberlin, Aberdeen, Miss., for Ferino.

H. M. Ray, U. S. Atty., J. Murray Akers, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before WISDOM and MORGAN, Circuit Judges, and DAVIS,* Judge of the U. S. Court of Claims.

DAVIS, Judge:

During the night of July 29–30, 1967, the federally-insured Bank of Mississippi at Mantachie, Mississippi, in rural Itawamba County, was broken into, and about $14,000 taken. Appellants were arrested later on July 30th, not at the scene of the crime but elsewhere in Itawamba County. They were indicted and convicted in the Northern District of Mississippi, in a joint jury trial, of aiding and abetting each other to enter the bank with intent to commit larceny, in violation of 18 U.S.C. §§ 2 and 2113(a). No confession was introduced and no issue is raised as to the sufficiency of the evidence or the instructions. The main questions center on the validity of the arrests and the searches made. We shall discuss the points *seriatim*.

I

*The arrest of Ferino and the seizure
of articles in his automobile*

Ferino was arrested about 3:30 A.M.- 3:45 A.M. on July 30th, near Mantachie. At that time, Deputy Sheriff Hendricks, Deputy Sheriff Buse, and State Patrolman Holcomb, investigating a report that youngsters were exploding fireworks on a householder's property, had set up a roadblock on the highway at which some cars were stopped. While the other two officers were away following a car which had sped from the roadblock, Hendricks noticed an unknown lone individual walking across the highway toward a parked

* Sitting by designation.

car with Alabama tags. Hendricks started toward this individual and, as the latter began to back the car out, called on him to stop; when the driver continued, Hendricks pulled out his revolver, ran alongside, ordering him to stop, which he did. In answer to queries, the driver (Ferino) said he had no driver's license or identification. Hendricks then formally placed him under arrest and had him remain in the car (since Hendricks, alone, was guarding three cars and several people) for some time until the other officers returned. Then, Ferino, again on inquiry, was unable to produce a driver's license or car registration. He was asked to step out of the car, and by shining a flashlight into the car the officers saw two billfolds inside; these were retrieved and turned out to have identifications of the other appellants, Williams and Butera. The three officers at the roadblock did not know, during this time, that the bank had been burglarized.

■ Ferino's warrantless arrest is challenged on the basis that Deputy Sheriff Hendricks had no authority, and also for lack of probable cause. Hendricks was never formally appointed in writing (as Mississippi law required), but he had been employed by the sheriff, had signed an oath of office, and had acted for a long time as a deputy in uniform, without challenge. Under Mississippi law he was at least a *de facto* peace officer (Mississippi Code, 1942 Ann., Sec. 4045; Miller v. Batson, 160 Miss. 642, 134 So. 567 (1931)) and had the right to arrest for motor vehicle violations and to demand driver's licenses (Mississippi Code, 1942 Ann., Sec. 8108).

The prosecution treats Ferino as having been arrested by Hendricks after the former had been unable to produce a license or identification. An arrest at that time certainly had a basis of prob-

able cause that he was driving without proper credentials.[1] Moreover, it is most probable that Hendricks, as he testified, did not start to move toward Ferino with the purpose of arresting him, but simply to have him identify himself in connection with the fireworks-exploding which had been going on—a reasonable request at that time of night and in those circumstances. Accordingly, it cannot be said that the arrest "began" when Hendricks first moved toward Ferino (and before it was known that the latter could not identify himself). See Smith v. State, 240 Miss. 738, 128 So.2d 857 (1961).

■ It would seem, however, that the detention first occurred when Hendricks drew his revolver, which was after Hendricks approached Ferino but before the latter was asked to produce license or identification. We believe that this stoppage-by-revolver was, in the circumstances, a reasonable "seizure" to prevent Ferino's escaping by car (cf. Terry v. Ohio, 392 U.S. 1, 20 ff., 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), a temporary "seizure" which did not have to be justified by "probable cause" to believe that a particular crime had been committed. Cf. Allen v. United States, 129 U.S.App. D.C. 61, 390 F.2d 476, 479 (1968). As indicated above, it was prudent and reasonable for Hendricks to seek identification from the unknown person on that rural highway at the time, and when this individual failed to stop in response to two calls, but instead began to drive away, Hendricks had no choice but either to let the man go or to exert the force of a display of his firearm.[2] Disorder had been reported in the neighborhood; a roadblock had been established to help investigation of this disorder; it was the dead of night; the scene was a rural highway near a small Mississippi town; the car the unknown man was driving

---

1. Hendricks testified that Ferino told him that some lady had brought him from Tupelo to Mantachie and that he had gotten out of her car to walk to his own. Hendricks had, however, seen no car approaching in that area; in addition, Ferino was a stranger to Hendricks who was a long-time resident of the county.

2. Since Hendricks was the only officer at the roadblock at that moment, he could not well give chase.

away had out-of-state tags; it was possible that this person was connected with the disorder but he had refused to heed two calls to halt—giving rise to reasonable suspicion that something was amiss; as a *de facto* deputy sheriff, Hendricks had the right to inspect drivers' licenses and demand identification. In these circumstances, the officer could validly decide to detain the driver momentarily, for identification purposes, rather than to let him drive away. That was a reasonable police practice for that time, that place, and those circumstances. By the same token, the conditions were such that the invasion of Ferino's privacy and the disruption of his legitimate activity was very minor.

The initial detention being lawful, it was then lawful for Hendricks to inquire as to the driver's license and identification. On the latter's failure to respond adequately, there was, as we have said, probable cause to arrest for unauthorized driving. The arrest was valid.

■ As for Butera's and Williams's billfolds, they were seen from without the car by use of a flashlight, after Ferino's arrest. Being in open view from the outside, they could be validly taken without a warrant. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069–1070 (1968). Since Ferino had twice said that he had no identification or license, a billfold—in which one ordinarily keeps both identification and a driver's permit—would obviously be significant. Moreover, under Mississippi law an officer can search a car after the lawful arrest of the driver for a traffic violation (Watts v. State, 196 So.2d 79 (Miss.1967)), and Warden v. Hayden, 387 U.S. 294, 87A S.Ct. 1642, 18 L.Ed.2d 782 (1967), allows seizure of evidential material as well as the fruits or instrumentalities of a crime.

## II

### *The arrest of Butera and Williams*

After Ferino's arrest, it was discovered in the early morning of July 30th that the bank had been entered. Coming from nearby Fulton to help in the investigation, Patrolman Knight (of that police department) met two strangers walking on the highway away from Mantachie, wet up to their knees. On inquiry, they said they had spent the night at the sister of one of them in Mantachie (but gave no names) and that they were going home (without naming a place); they asked the name of the next town and U. S. highway. Knight offered them a ride to Fulton (after first going to Mantachie); they preferred to be picked up on his way back to Fulton. In Mantachie, Knight reported the encounter to State Patrolman Holcomb and an FBI agent. These three returned to the highway where Knight had seen the two and saw them further down the road reaching for the handle of the door of a car parked in front of a house. On the officer's approach, the two men ran into the woods, leaving the car door open. Holcomb broadcast a description of the men over his car radio, and later that day Butera and Williams, answering that description, were arrested by other officers, without a warrant, in a remote area of the county, not too far from the woods the two men had earlier entered.

A search of Butera at this arrest produced $315 in ones, fives, tens, and twenties. At the trial, three of the fives were traced directly, by expert testimony, to five-dollar bills from the bank's vault, and there was also less direct testimony connecting the other small bills to the bank. A tear gas pen was found on Williams.

■ Appellants insist that there was no probable cause for the warrantless arrest of Butera and Williams, but we disagree. By the time of this arrest, the facts known to the officers concerned with searching for the two strangers first seen by officer Knight (information which was communicated either directly or impliedly to the officers who actually made the seizure) included: (a) the burglary of the bank, indicating that more than one person was probably in-

**8**

volved;[3] (b) the arrest of Ferino, an out-of-stater, and its surrounding circumstances, including the two billfolds with their separate identifications of two out-of-state men other than Ferino; (c) the statements by the two men to Knight, their appearance when he first met them, and their obviously being complete strangers to the area; (d) the actions of the two men in trying to open a car door and in running into the woods when the officers returned from Mantachie; (e) their descriptions which were broadcast; (f) their being found where they were. This accumulated knowledge satisfied the standard of probable cause to believe that the two arrested men were connected with the burglary. It follows, too, that the search of their persons, at the time of arrest, was proper because they had been validly arrested.

### III

*The seizure of appellants' clothing*

As already stated, Ferino was arrested near Mantachie at about 3:30 A.M. or 3:45 A.M. on July 30th; shortly thereafter, he was taken to the jail in neighboring Fulton. Butera and Williams were arrested at about 9 A.M. the same morning, and also taken to Fulton. There, FBI agents talked to the three men, beginning sometime between 9:30 and 9:45 A.M., advising them of their rights and interrogating them. The appellants were also fingerprinted and "booked" at that time, and their clothing was removed. The record does not reveal precisely when the clothing was taken, but an FBI agent testified that it was during the fingerprinting and "booking" process—"shortly" after appellants reached the jail, "prior to Noon or around Noon".

The FBI agents desired the clothing in order to send it to the FBI laboratory in Washington, and it was so sent (apparently as soon as it could be). As a re-

sult of this inquiry and testing by the laboratory, it was shown at the trial by expert testimony that the clothing (Ferino's and Williams') contained traces of an insulation material which was the same as that used in the bank's vault door and that Butera's and Williams' clothing had traces of "slag balls" (typical of a metal-burning or metal-cutting operation) similar to "slag balls" from the safe in the vault. This evidence and the clothing were admitted over objections that the taking of the clothing was illegal.

■ We hold that the seizure of the clothing was proper as an incident to the arrest of appellants, and that the ensuing search was valid. The men obviously could not be disrobed in public at the places they were first taken into custody—not until they reached the jail at Fulton where other clothing was available for them. Their clothing was removed within a short period after they arrived there, and it is plain that the FBI agents intended from the beginning of their investigation to take the suspects' clothing and have it tested in the laboratory for any tell-tale evidence which might be discovered. This taking-for-testing was not an afterthought, but rather an action which was an integral part of, and therefore incident to, the process of arrest.[4] See Golliher v. United States, 362 F.2d 594, 599–602 (C.A. 8, 1966); Hancock v. Nelson, 363 F.2d 249, 252 (C.A. 1, 1966).

These facts differentiate this case from the Court's recent decision in Brett v. United States, 5 Cir., 1969, 412 F.2d 401, in which the search of the clothing, which took place three days after the arrest, was held invalid. The Court pointed out that the clothing had been in routine jail custody for ordinary safekeeping for three days, and that the "search was not incident to an arrest, because it was not even close to contemporaneous" (p. 405), and the opinion distinguished cases

---

3. For instance, near the bank there were found acetylene torches and other heavy equipment obviously used in the burglary.

4. It was reasonable to deal with the three suspects at one time, on the morning of July 30th, and not to take Ferino's clothing before dawn when he was first brought to Fulton.

such as *Golliher* and *Hancock, supra,* on the ground that those decisions were "concerned with testing of clothing seized incident to arrest" (p. 406). The present case, as we have pointed out, is likewise concerned with testing of clothing seized incident to arrest, clothing taken substantially contemporaneously with the arrests and for the very purpose of testing. See Cassady v. United States, 410 F.2d 379, 380 (C.A. 5, 1969).

## IV

### *Denial of a speedy trial*

▇ Williams claims that he was denied a speedy trial. The dates are these:—his arrest took place on July 30, 1967, the commissioner held him on August 7th, the indictment was returned on January 30, 1968, not guilty pleas were entered on February 7, 1968, and the trial took place in June 1968. On February 15, 1968, at a hearing before Circuit Judge Clayton (sitting by designation in the District Court) the pleas were confirmed and the appellants were given thirty days in which to file motions. Williams' counsel said at that time that Williams did not wish any additional time, and asked for a trial. Judge Clayton responded that the case would be set for trial in due course, but not before the expiration of the thirty days "the other two defendants may use, if they care to do so". On March 13, 1968 (not quite thirty days later), Williams moved *pro se* for a speedy trial and for severance, and the Government responded that the motions were improper because he was then represented by court-appointed counsel. The latter did not thereafter ask for a trial until shortly before it was actually held. In addition, there is no showing (or substantial offer to show) that the delay prejudiced Williams in his

preparation for trial or in the trial itself, and it is clear that most of the delay was due to the lack of a regular judge in the district.[5] In the particular circumstances, though the delay was long, the constitutional claim of lack of a speedy trial must be rejected. See Reece v. United States, 337 F.2d 852 (C.A. 5, 1964).

## V

### *Williams' claims of excessive bail and right to a severance*

▇ The commissioner refused to reduce Williams' bail below $25,000, which he was unable to make,[6] but he never asked relief from the district court or took an appeal to this court, as he should have if he wished to raise the issue. Stack v. Boyle, 342 U.S. 1, 6, 72 S.Ct. 1, 4, 96 L.Ed. 3, 7 (1951); Hemphill v. United States, 392 F.2d 45, 47 (C.A. 8, 1968). In the absence of some valid excuse or justification—and none is given here—it is too late to do so after conviction. There is, furthermore, no showing, or solid offer to prove, that Williams' incarceration significantly impeded his preparation for trial or his consultation with counsel.

▇ Williams also says that the trial court should have granted him a severance. There was, however, no real reason to try Williams separately on this joint aiding-and-abetting indictment. There was no problem of confessions, or other condition making severance appropriate. The question of separate trials was within the District Court's discretion (Smith v. United States, 385 F.2d 34, 37–38 (C.A. 5, 1967)), and no abuse is shown.

The judgments are

Affirmed

---

5. Judge Clayton had been appointed to the Court of Appeals, and Judge Keady did not take office until April 26, 1968. During the period Judge Clayton sat by designation in the District Court (after he had taken his place on this court on No-vember 24, 1967), no trials were held. The first trial was held on May 4, 1968, after Judge Keady assumed his seat.

6. The other two appellants were released on bail.