**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James G. MASLANKA, Walter Richard Ercius, Steven Garrett Lamb, Barry Wesley Korn, Floyd Farrell Capo, Michael John Knight, and David Strongosky, Defendants-Appellants.**

No. 73–3416.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1974.

Rehearings and Rehearing En Banc Denied Dec. 4, 1974.

Hugh M. Davenport, Jacksonville, Fla., Oscar B. Goodman, Las Vegas, Nev., for Maslanka.

Michael Knight, pro se.

Robert A. Douglass, St. Petersburg, Fla., for Ercius.

Martin G. Weinberg, Joseph S. Oteri, Boston, Mass., for Lamb and Korn.

Percy Foreman, Dick DeGuerin, Houston, Tex., for Capo, Knight, Strongosky.

William Stafford, Jr., U. S. Atty., Robert L. Crongeyer, Jr., Asst. U. S. Atty., Pensacola, Fla., Stewart J. Carrouth, Melvin R. Horne, Asst. U. S. Attys., Tallahassee, Fla., for plaintiff-appellee.

Before MOORE,* AINSWORTH and RONEY, Circuit Judges.

MOORE, Circuit Judge:

This appeal is from judgments of conviction entered against appellants in the United States District Court for the Northern District of Florida after a jury trial. Each appellant was accused and convicted of conspiring to import marijuana into the United States, 21 U. S.C. § 963 (1970) [1] (Count 1); actual importation of the marijuana, 21 U.S.C. § 952(a) (1970) [2] (Count 2); conspiring to possess the marijuana with intent to distribute, 21 U.S.C. § 846 (1970) [3] (Count 3); and actual possession of the marijuana with intent to distribute, 21 U.S.C. § 841(a) (1970) [4] (Count 4).

Appellants were each sentenced to five years' imprisonment on each count—to be served consecutively in each case with the exception of Ercius who was sentenced to serve his sentences on counts 3 and 4 concurrently with those on counts 1 and 2. We reverse the convictions on counts 1 and 2, the importation counts, and order that the indictments on these counts be dismissed. We affirm the convictions on counts 3 and 4, the possession counts.

## The Facts

On March 5, 1973, Florida State Narcotics Agents were informed by two fishermen that there was a large pile of a substance believed by them to be marijuana at a spot along Rocky Creek, a navigable inlet of the Gulf of Mexico, across from Buckeye Landing.[5] Agents Mortonson, Herring, and Kinsey along with Deputy Dyals, were sent to investigate this discovery and, upon crossing Rocky Creek, they located 18,000 pounds of what a field test proved to be marijuana. Shortly after this determination, Agent Kinsey noticed a blue Cadillac across Rocky Creek on the dirt road approaching the landing. He watched the progress of the Cadillac which, when it reached a spot on the road where the driver could see the unmarked police car

---

* Hon. Leonard P. Moore, Senior Circuit Judge for the Second Circuit, sitting by designation.

1. 21 U.S.C. § 963 (1970) reads:
 Any person who attempts or conspires to commit any offense defined in this subchapter [II, entitled "Import and Export"] is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. 21 U.S.C. § 952(a) (1970) reads in part:
 It shall be unlawful to import into the customs territory of the United States from any place thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, . . ..
 Marijuana is listed in schedule I, 21 U.S.C. § 812(c) (I) (c) (10) (1970).

3. 21 U.S.C. § 846 (1970) is identical with 21 U.S.C. § 963 (1970) set out at footnote 1,

*supra*, and has reference to offenses listed in subchapter I, entitled "Control and Enforcement."

4. 21 U.S.C. § 841(a) (1970) reads in part:
 Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance ; . . ..

5. Rocky Creek is located approximately 100 miles north of Tampa in a remote section of rural Dixie County near the town of Steinhatchee. Buckeye Landing, so-called because the Buckeye Paper Company, which owns some 70,000 acres around Rocky Creek, maintains a dock and picnic table there for the use of its employees and, apparently, the general public, 686a [all appendix references are to the general appendix of appellants unless otherwise noted], is reached by way of a narrow dirt road which intersects Florida State Route 361 which runs parallel to the shoreline.

at the landing, immediately turned back toward Florida State Route 361. Agent Kinsey shouted to one of their number, Agent Mortonson, who had remained with the police car, to follow "the blue car." Mortonson started off in pursuit.

When Mortonson reached the intersection of the dirt road with Route 361, he saw a blue car, the only vehicle in sight, about half a mile north on Route 361, accelerating rapidly. Mortonson, after placing a blue revolving light on his dashboard, pursued the blue car, flashing his headlights and blowing his horn. The pursuit lasted approximately five miles, with Agent Mortonson reaching speeds of 105 miles per hour. After the Cadillac had pulled over, Agent Mortonson stopped his car behind it and, pulling his gun, approached the vehicle.[6] Mortonson ordered the driver, appellant Maslanka, out of the car and arrested him for "attempting to elude a police officer and speeding." While he was "patting down" Maslanka, Mortonson noticed a strong odor of marijuana about Maslanka's person.[7] He then ordered the other two occupants—appellants Knight and Ercius—out of the car, and discovered the odor of marijuana around them as well. These three appellants were then arrested for the possession of the marijuana at Rocky Creek.

By this time another agent had arrived and the appellants were searched. The search of Maslanka revealed an airline ticket for passage from Kingston, Jamaica, to Ocho Rios and several receipts from Jamaican stores for clothing purchases. The search of Knight revealed a piece of paper covered with additions—apparently some sort of tally—cigarette papers and a cigarette made from what was later ascertained to be marijuana. It was also noted that the Cadillac bore out-of-state plates.

Knight and Ercius were then taken to a police station. Maslanka, however, was taken by Mortonson in company with several other officers back to the landing. After they turned off Route 361 onto the dirt road and had proceeded to within 1,500–1,800 feet of the landing, they overtook a blue pick-up truck with Michigan license plates headed in the direction of Rocky Creek. Appellant Capo was driving, appellants Strongosky and Korn were with him in the cab, and appellant Lamb was in the open rear portion of the vehicle. Appellants were stopped and informed of the purpose of the agents' presence at the landing. They were then given their *Miranda* warnings, and asked to step out of the truck. It was noticed that three of appellants, Strongosky, Korn, and Lamb, were dressed in work clothes covered with vegetable particles and were unkempt as if they had been working in hay. It was further noticed that there was a strong smell of marijuana about these three. At this point all four, Capo, Strongosky, Korn and Lamb, were requested to accompany the officers to the landing where they were arrested.

While these appellants were taken off to jail, the agents began shifting the marijuana so that it could be removed

---

6.
Q: All right. And when you came up you stopped your car behind it how many feet about?
A: Approximately fifteen to twenty feet.
Q: And when you got out did you take your gun in your hand?
A: Yes, sir, I did.

\* \* \* \* \*

Q: And when you gave orders to them, whoever was in the car, to get out one at a time, were you pointing the gun at the car?
A: Yes, sir, I was.

\* \* \* \* \*

Q: And at the individuals as they each one after the other got out of the car?
A: Yes, sir.

\* \* \* \* \*

Q: And as you were talking to them did you —did you continue pointing the gun at them?
A: Yes, sir, I did.
697a–98a.

7. Agent Mortonson testified that he had worked in the narcotics field during his almost ten years as a law enforcement officer and had smelled marijuana "many" times. 639a.

for safekeeping. As it was eventually determined that the pile contained 18,000 pounds of the substance, the moving operation took most of the night.[8] The sacking containing the marijuana was marked Kingston, Jamaica, the bags apparently having been made for the Shell Chemical Company operations in that city. At the site a barge half full of marijuana was discovered and it was eventually learned by investigation that it bore the fingerprints of Knight and Korn. It also was learned that this barge belonged to Capo.

Early the next morning, after the marijuana had been safely transported, Agents Kinsey and Mortonson returned to the jail where appellants had been incarcerated, took their clothes (with the exception of Capo's) and sent them to a laboratory.[9] The laboratory report as introduced at trial stated that minute particles of marijuana were contained in the clothing along with bits of jute fiber similar to that used in the sacking which contained the marijuana.

### Probable Cause to Arrest

Each appellant contends that the case against him should have been dismissed because it stemmed from an arrest based on insufficient cause. The trial court at the suppression hearing overruled appellants' objections stating with regard to appellants Maslanka, Knight, and Ercius, who were in the blue Cadillac:

> An officer who did not stop that vehicle ought to be removed from office in circumstances such as these.

Likewise with regard to the other appellants who were apprehended in the blue pick-up truck he ruled:

The arrest of Mr. Capo and the other occupants of that vehicle is obviously not an impermissible arrest because of the circumstances and I am not going to dwell further on that.

With these conclusions we agree.

■ To determine the presence or absence of probable cause to arrest, one must consider the totality of the circumstances surrounding the arrest. As the Supreme Court stated in Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964):

> Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that petitioner had committed or was committing an offense.

379 U.S. at 91, 85 S.Ct. at 225. *See also* United States v. Bowers, 458 F.2d 1045 (5th Cir.), cert. den., 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972).

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

■ The marijuana was hidden in a remote area of a rural county. This area was approached by a narrow dead-

---

8. The arrests took place in the late afternoon or early evening. 635a.

9. Q: Had either you [Agent Mortonson] or Agent Kinsey meanwhile obtained a search warrant for these clothes so as to—as a basis for your taking of the clothes and having them sent to the lab?

A: No, sir, we had not.

Q: You just did that as a part of the follow up of the routine investigation of the case, did you not?

A: That is correct.

Q: And you did not feel that you needed a search warrant?

A: No.

Q: But you had them in custody, is that correct?

A: Correct, that is correct.

154a–55a.

end road. A car came down the road but, upon observing an unmarked car at the landing, turned back, apparently in flight, toward the highway. Certainly these facts provided reason for Agent Mortonson to investigate. Mortonson reached Route 361 and observed the car rapidly moving toward the north. His pursuit lasted for five miles at speeds around 100 miles per hour. First, Agent Mortonson arrested the driver for speeding,[10] and then noticed the pervading smell of marijuana about Maslanka's person as well as the passengers.

An officer need not have probable cause before investigating suspicious circumstances:

> We believe that these . . . officers would have been derelict in carrying out their appointed duties had they neglected to investigate given all of the circumstances at hand, . . . .

United States v. Allen, 472 F.2d 145, 147 (5th Cir. 1973).

 Similarly, it is obvious that the agents, in stopping the blue pick-up truck with the out-of-state plates, were acting within their authority to make an investigatory stop. The road to Rocky Creek was not well frequented, and the last car that had come down it had held three persons who were covered with marijuana. The agents merely stopped the truck and, having given the occupants their *Miranda* warnings, asked them where they were going. At that point the fact that three of the four smelled of marijuana supplied a probable cause for their arrest.

### The Seizure of Appellants' Clothing

The warrantless seizure of appellants' clothing[11] took place at the jail some twelve hours or more after their arrest. This procedure is attacked by appellants

---

10. We are cognizant that Agent Mortonson approached the Cadillac with his revolver drawn. *See* note 6, *supra*. It may be that, under different circumstances, our inquiry for probable cause would have to be conducted at this point. We note that the Ninth Circuit case of United States v. Strickler, 490 F.2d 378 (9th Cir. 1974), held that "an armed approach to a surrounded vehicle whose occupants have been commanded to raise their hands" was a full blown arrest, 490 F.2d at 380, and considered probable cause at that point.

First, it is clear that there are significant differences between the *Strickler* case and the one at bar: Agent Mortonson was alone on a lonely highway; he wished to speak to the driver of a car, the occupants of which were three young males, who had just led him on a five-mile chase, at high rates of speed. Mortonson was under a duty to investigate the situation. By drawing his revolver as he approached the Cadillac it may reasonably be contended he was exhibiting proper caution under the circumstances. It does not seem to us that, without regard to motive, solely because an officer draws his weapon, an investigatory stop is turned into an arrest. To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Second, it is not necessary under the present facts to distinguish the *Strickler* case.

Agent Mortonson certainly had probable cause to arrest the driver of the Cadillac for speeding, whether or not his actions in so doing were subjectively motivated by the 18,000 pounds of marijuana back at the landing. Thus, the initial arrest of Maslanka was proper. United States v. Saunders, 476 F.2d 5 (5th Cir. 1973).

Nor does the cited case of Graham v. State, 60 So.2d 186 (Fla.1952) hold to the contrary for in that case not only were there grave doubts whether appellant, who had been arrested for reckless driving, was guilty of that offense but also it appeared on the record that the arresting officer had been lying in wait for appellant and had intended to arrest her on whatever pretext appeared to be available in order to facilitate his search of her car.

The fact that appellant Maslanka was not prosecuted for the acts for which he was initially arrested certainly does not, in and of itself, make that arrest a sham. Since appellants appear to concede, as with all candor they must, that Maslanka was in fact speeding, their contention that there was no probable cause for his arrest is without merit.

11. Capo's clothing was not taken with the others' apparently because Capo was too large to fit the alternate clothing available at the jail. Br. of appellants Capo, Knight and Strongosky at 8 n. 1.

as being violative of their Fourth Amendment rights. It is argued that since appellants were already in custody, *see* note 9 *supra,* and had been in custody all night, there was no reason for the agents not to apply for a warrant.

This issue has undergone considerable judicial scrutiny in recent cases. The crux of the matter is not the warrantless seizure of the clothes for the purposes of laboratory testing for such seizures have been generally upheld. Rather, the difficulty arises out of the delay between the arrests and the seizure.

However, any difficulty with respect to the facts of this case has been put to rest by the Supreme Court's recent decision in United States v. Edwards, et al., 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In *Edwards, supra,* Edwards had been arrested at 11:00 P.M. and taken to the local jail. The next morning substitute clothing was provided and his clothing, worn at the time of the alleged crime, was taken for examination for traces of paint chips [marijuana here] which might have been related to paint chips discovered at the scene of the crime. The trial court admitted proof obtained from the clothing, the Court of Appeals reversed (474 F.2d 1206 (6th Cir. 1973)) but on certiorari, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771, the Supreme Court reversed and concluded that "the Fourth Amendment should not be extended to invalidate the search and seizure in the circumstances of this case." 415 U.S. at 802, 94 S.Ct. at 1236. The facts now before us are sufficiently similar to warrant a similar conclusion.

■ A search incident to an arrest must be reasonably contemporaneous to that arrest, but it is a test of reasonableness in light of the particular circumstances that must be applied. Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); United States v. Preston, 376 U.S. 364, 84 S.Ct.

881, 11 L.Ed.2d 777 (1964). By way of illustration is United States v. Caruso, 358 F.2d 184 (2d Cir. 1966) in which a prisoner's clothes were taken from him some six hours after his arrest. The Court stated:

> Here the clothes were constantly in sight, were taken on the person of the suspect at the time of arrest and were continuously in custody. [citation omitted] The appellant's contention means that the seizure of his clothing could have been made constitutionally only if, immediately on his arrest, he had been stripped to the buff on the public highway. Even though that April 13th may have been a very pleasant spring day, we are of the opinion that the argument is somewhat extreme.

358 F.2d at 185–186.

In a similar vein is United States v. Williams, 416 F.2d 4 (5th Cir. 1969) in which this Court, overcoming objections to an arrest-seizure delay of nine hours, stated:

> This taking-for-testing was not an afterthought, but rather an action which was an integral part of, and therefore incident to, the process of arrest.

416 F.2d at 8. *See also* United States v. Gonzalez-Perez, 426 F.2d 1283 (5th Cir. 1970).

■ Testing the facts of the present case by these cases we find no violation of constitutional rights. The first duty of the arresting officers, after the apprehension of appellants, was to secure the marijuana. This, considering the sheer bulk of the material to be moved, reasonably took all night. Then, at the first practicable moment, the agents returned to the jail where the appellants were held and took their clothes for analysis. Under the particular circumstances of this case, we approve this warrantless seizure as properly incident to the arrest.[12]

---

12. Our holding on this point obviates any need to consider the Government's alterna-

tive position—that the seizure of the clothes was a permissible "second glance" at the ev-

*Sufficiency of the Evidence with
regard to the Possession
Counts*

Maslanka, Capo, and Ercius contend that the Government introduced insufficient evidence to support their convictions on Counts 3 (conspiring to possess marijuana with intent to distribute) and 4 (possession of marijuana with intent to distribute).[13] *After considering the evidence presented in the light most favorable to the Government, as is our duty on the present appeal, we find that it is sufficient to uphold the convictions.* We will first review the evidence underlying the convictions on the latter count.

■ Maslanka, Knight and Ercius were first noticed in a remote district on a road at the end of which was concealed an enormous cache of marijuana. Upon noticing that there were unknown persons at the landing, they fled the scene at a high rate of speed. When apprehended they were so covered with marijuana residue that the investigating officer could smell it about them. Jute fibers similar to the sacks containing the marijuana were found in their clothing. Further Knight's fingerprints were found at the scene of the cache. On the basis of these facts, a reasonable jury could draw a connection between Maslanka, Knight and Ercius and the cache at Rocky Creek, and could well find them guilty beyond a reasonable doubt. For an exposition of the standard of review appropriate here, *see* United States v. Quinones-Alvarado, 464 F.2d 12 (5th Cir.), cert. denied, 409 U.S. 1026, 93 S.Ct. 474, 34 L.Ed.2d 320 (1972).

■ Capo argues that there was no evidence that his clothes contained the marijuana and jute fibers found on the others. However, evidence was offered tending to prove that Capo was seen in company with Lamb on the day the cache was discovered; that Capo's boat was operating in Rocky Creek the night before the discovery; that Capo drove Strongosky, Lamb and Korn to within 1,800 feet of Buckeye Landing the day the marijuana was discovered before being stopped by the police; that the clothes of Capo's passengers were covered with marijuana and jute particles; that part of the marijuana was discovered in a scow belonging to Capo; that one of his passengers' fingerprints were found on the scene of the marijuana cache; and that when Capo was questioned by the police concerning his presence at Buckeye Landing, he stated that he was searching for a lost boat that his passengers had said was in the environs of Rocky Creek. The connective factors between the marijuana cache and his passengers have already been set forth. Thus, his suggestion that his passengers were in the process of leading him to the scene of their crime to recover his scow—half full of their marijuana—is somewhat beyond credibility. If he were not at Rocky Creek to find his scow in the company of the others, a jury might well argue, why was he there? Although mere association or presence would not be enough to support the present conviction, there is no doubt that the present case proved a more intimate relationship.

■ Turning now to the conspiracy to possess with intent to distribute, the major attack on this count was that there was little evidence connecting the several alleged conspirators. Of course,

idence. For a discussion of this exception to the usual search and seizure requirements, *see* United States v. Grill, 484 F.2d 990 (5th Cir. 1973) and United States v. Brett, 412 F.2d 401 (5th Cir. 1969).

13. Appellants Knight, Korn, Lamb and Strongosky do not raise this argument in their briefs. In the cases of Knight and Korn whose fingerprints put them at the scene of the crime, this omission seems most reasonable, but in the cases of Lamb and Strongosky it would seem that they have just as valid an argument here as appellants Maslanka and Ercius. Since, however, we find against Maslanka and Ercius on this point, we may note that we would similarly find against Lamb and Strongosky.

once evidence of a conspiracy exists, only slight evidence is required to connect each defendant to the joint plan. United States v. Lee, 483 F.2d 968 (5th Cir. 1973). The fact that there was a huge pile of marijuana and that all appellants (with the exception of Capo) smelled of the substance and all were in the vicinity of the cache, is more than sufficient under the circumstances. Neither has there been any evidence that there was another enormous pile of marijuana where appellants could become covered with the substance. Nor is it very likely that appellants had merely happened upon the pile and were removing it on an individual basis. With regard to Capo, his association with the other conspirators and the use of his boat to transport the marijuana taken in addition to the unlikeliness of his explanation for his presence at Rocky Creek also is adequate.

### Sufficiency of the Evidence with regard to the Importation Counts

As to Counts 1 and 2, conspiracy to import the marijuana, and actual importation of the marijuana, the Government's case grows weaker. Evidence was introduced that the marijuana probably came from Jamaica—at least it was contained in sacking from Jamaica. There was also evidence introduced that one of appellants, Maslanka, had been in Jamaica less than a month previous to the discovery of the marijuana, but there was no evidence that while in Jamaica Maslanka had engaged in the purchase of any drugs. A final bit of evidence is that Capo's boat was heard the night before the discovery running back and forth between Rocky Creek and the Gulf of Mexico. However, there was no evidence that his boat ever went outside the territorial waters or met with any other craft that had. The Government contends that this is sufficient evidence to support a conviction for importation and that the proof submitted here is

more suggestive of importation than that in United States v. Quinones-Alvarado, 464 F.2d 12 (5th Cir. 1972). Therefore, concludes the government, the jury had enough evidence before it to draw inferences which would exclude every reasonable hypothesis of innocence. We must disagree.

The crucial element of proof missing from the present case and present in *Quinones-Alvarado, supra,* and United States v. Warner, 441 F.2d 821 (5th Cir. 1971), relied on by the Government, is a connection between members of the alleged conspiracy and the method of the importation. The marijuana did not come to this country from Jamaica in Capo's boat. It is possible that Capo's boat was used to transfer the marijuana from another boat on the night in question; it is possible that members of the alleged conspiracy arranged to have the marijuana secreted at some spot other than Rocky Creek and then moved it there later. But there was no proof at all that either of these events happened. To find guilt either one must assume that the appellants were part of a larger conspiracy, other members of which arranged the importation; or that one of the appellants, most likely Maslanka, while he was in Jamaica, arranged the importation. While either of these theories provides the basis for speculation and it seems fairly certain that such a large amount of marijuana did not grow in Dixie County, such speculation does not provide proper support for the verdict on these counts. Accordingly, the convictions on Counts 1 and 2 are reversed and the case is remanded with instructions to dismiss the indictment on these counts.

### The Importation Charge

Our decision above makes it unnecessary to consider alternative objections to the convictions on Counts 1 and 2.[14]

14. For this reason, we need not consider the claim that the two conspiracy counts were duplicitous. *Compare* Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23

*Sentencing Procedure*

All appellants, save Ercius, assail some portion of the procedure followed by the court in their sentencing. It is argued that the court should have (a) disclosed the presentence reports and (b) given more weight to the individual aspects of the various appellants' cases. It is also claimed that the court in sentencing appellants penalized them for exercising their Fifth Amendment rights. There is no merit in any of these arguments.

 First, although there is authority in support of general disclosure of presentence reports, *see inter alia* United States v. Brown, 470 F.2d 285 (2d Cir. 1972), there is no doubt that such a disclosure rests in the discretion of the trial judge. United States v. Warren, 432 F.2d 772 (5th Cir. 1970). We have no reason to suppose that discretion was abused here. Second, the determination of what weight to give individual factors is also within the trial judge's discretion, especially in this case where it is clear that the court considered the various factors only to conclude that they were of little importance with the exception of the ages of the appellants. We have no cause to substitute our views for those of the sentencing judge. Third, after a careful consideration of the record, we conclude that the appellants were in no way punished for the exercise of their Fifth Amendment rights in refusing to testify but, rather, that the severity of their sentences stemmed from the large size of their operation and their lack of cooperation with the Government after their convictions on the basis of overwhelming evidence.

All arguments [15] raised by appellants having been considered, we affirm their convictions on Counts 3 and 4, and reverse their convictions on Counts 1 and

2 and order that the indictments on those counts be dismissed. Since we are reversing the convictions on Counts 1 and 2, we remand for resentencing in accordance with this opinion.

---

(1947) with American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1966). *See also* United States v. Mori, 444 F.2d 240 (5th Cir. 1971).

15. We have read with interest the views of appellants Maslanka and Ercius with regard to the legality of the laws relating to marijuana. We find them, however, to be legally without merit.