591 F.2d 1091
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jose Antonio SOTO, William Villalba, Eddy Lievano, Pastor
Alvarez, Rafael Rivero, Alberto Bruno Avila, Francisco
Quintana, Gilberto Acosta, Roman Pardon-Gonzalez, Jesus
Aniero, Rolando Sosa, Prudencio Martinez, Juan Pedrosa,
Carlos Botano and Alberto Cortes, Defendants-Appellants.
 No. 78-5065.
 United States Court of Appeals,
Fifth Circuit.
 March 22, 1979.
Rehearings Denied April 17, 1979.
 
 Gerald Kogan, Geoffrey C. Fleck, Miami, Fla., for Soto, Villalba, Lievano, Alvarez, Rivero, Avila and Quintana.
 Robert L. Moore, Miami, Fla., Richard A. Moore, Miami, Fla., for Acosta.
 Donald F. Spain, Miami, Fla., John H. Lipinski, Miami, Fla., for Pardon, Gonzalez, Sosa, Cortes, Botano, Pedrosa, Martinez and Aniero.
 Jack V. Eskenazi, U. S. Atty., Joel C. Fanning, Linda C. Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before THORNBERRY, GODBOLD and HILL, Circuit Judges.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 This appeal is from judgments of conviction entered against the appellants after a jury trial. Each of the fifteen appellants was accused and convicted of conspiring to import marijuana into the United States in violation of 21 U.S.C. § 963 (Count I); conspiring to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846 (Count II); actual possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count III); and actual importation of marijuana in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 2 (Count IV). Appellant Quintana was sentenced to imprisonment for concurrent terms of four years and received concurrent special parole terms of two years on each count. The other fourteen appellants were each sentenced to imprisonment for concurrent terms of three years and received concurrent special parole terms of two years on each count.
 
 
 2
 The issues on appeal are: (1) whether the District Court properly denied Sosa's and Villalba's motions to suppress evidence of the marijuana found in the vans they were driving; (2) whether samples of marijuana, taken from bales which were randomly selected from the total amount confiscated, were properly admitted into evidence; (3) whether there was prejudicial variance between the crime charged in the indictment and the proof adduced at trial; (4) whether the District Court properly denied the motions for mistrial made by thirteen of the appellants when counsel for Alvarez and Alvila made certain statements in his closing argument; and (5) whether the convictions are supported by sufficient evidence. We find no merit in the appellants' first four arguments, but we find the claim that there was insufficient evidence meritorious with regard to all four counts in the cases against Quintana and Rivero and with regard to the two importation counts in the cases against the thirteen other appellants. Hence, we reverse the convictions on all four counts against Quintana and Rivero, reverse the convictions on the two importation counts against the thirteen other appellants, but affirm the convictions on the two possession counts against those same thirteen.
 
 I. The Facts
 
 3
 The facts, considered in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), reveal the following pattern of events. The raid during which the appellants were apprehended was the result of two weeks of surveillance conducted by Customs Patrol Officers, with the assistance of Lee and Collier County officers, on two beach houses in Bonita Springs, Florida. On the night of the arrests, July 11, 1977, four groups of officers were participating in the surveillance. Two officers were stationed two to three miles south of the beach houses in a Winnebago, referred to as the command post, which was equipped with marine radar; they were monitoring the Gulf of Mexico in order to detect boats headed north to the area off the shore of the beach houses. Three officers were stationed approximately one hundred and fifty yards north of the two beach houses and were positioned at the edge of the beach so that they could observe activity in the beach area behind the houses; they were in radio contact with two more officers in a backup assistance vehicle one block up the street. The third group consisted of some five officers who were in two boats in the Gulf of Mexico in the area near Bonita Springs; they were assigned to monitor visually any suspect boats picked up on the marine radar. The final group was composed of about five officers who were in the general area of the beach houses or on the roads leading to and from that area; they were observing general activity in the area, including motor vehicle traffic.
 
 
 4
 Upon arriving at the Winnebago command post at approximately 10:00 p. m. on July 11, 1977, Officer Martinez noticed on the horizon in the Gulf of Mexico lights of what appeared to be a large vessel heading north. After turning on the radar, he located a solitary "blip" on the radar screen which corresponded with the position of the lighted target that he could observe with his naked eye. The object was approximately three miles out to sea and moving in a northerly direction. The object continued to move north for some thirty minutes, during which time its lights were extinguished, and then it remained stationary for about one hour at a position approximately two miles off the coast where the beach houses were located. At this point, about 11:30 p. m., Martinez notified the beach house surveillance group of the target's sustained position near them and also advised the group in the two boats of his observations and directed them to the area of the target. He and Officer Kranz then left the command post and drove in separate vehicles toward the beach houses.
 
 
 5
 In the meantime, one of the officers in the vicinity of the beach houses had also made an observation of traffic attributable to the beach houses. Officer Tomlinson had observed, sometime between 10:00 p. m. and midnight, a red van turn onto Bonita Beach Road, the road which leads to the two beach houses, and proceed west toward the beach and the area of the houses. He had also observed a light colored van, described as beige or light yellow, parked at one of the two beach houses where he had been informed a large marijuana drop would be made.
 
 
 6
 As Officers Martinez and Kranz drove west down Bonita Beach Road toward the two surveilled beach houses at about 12:15 a. m. on July 12, 1977, they saw two vans, one behind the other, coming from the direction of the beach houses and heading east. Officer Kranz noticed that one was red and the other was tan and that they appeared to be carrying heavy loads. Since the vans were spotted on the only road leaving the area where the marijuana drop was thought to be occurring, he concluded that the vans could well be involved and issued a "BOLO" ("be on the lookout") request that the two vans be stopped for investigation. Martinez and Kranz then positioned themselves down the street from the beach houses and waited to hear from the surveillance group on the beach.
 
 
 7
 The officers on the beach had arrived at their station, one hundred and fifty yards north of the beach houses, at about 9:30 or 10:00 p. m. on the evening of July 11, 1977. They had immediately observed a man at the edge of the water about fifty yards north of them. He was holding a fishing rig known as a Cuban Yo-yo and a hand-held radio, but the officers saw no other fishing equipment or fish. The "fisherman" was talking into the radio, looking up and down the beach, and, periodically during the evening, walking back and forth between the woods behind the beach and the water.[1] At approximately 12:45 a. m. in the early morning of July 12, 1977, the officers heard boats offshore. Two minutes later, Officer Sutton crawled out to the beach with a nightscope and saw six to eight people on the beach south of him carrying large objects from a boat at the water's edge to the area of the two houses. At 1:00 a. m., after notifying the other officers who were on stand-by in the area of the beach houses, Officer Sutton and his two fellow beach surveillers moved toward the people on the beach; they identified themselves as customs officials in English and Spanish. The men immediately scattered in various directions, and Appellants Pedroso and Soto ran, in the darkness and confusion, directly towards the officers. They were then apprehended, although all of the other people on the beach escaped. The officers discovered that the large objects they had observed the men carrying were bales of what they identified, by virtue of previous experience with its appearance and odor, to be marijuana. Four bales were found on the beach and four in the small boat at the water's edge.
 
 
 8
 Five to ten minutes after the officers surveilling the beach made their raid, the officers at sea on the two government boats approached and boarded the "Captain Salty," a sixty-three foot long shrimp boat anchored about two miles off the coast of Bonita Beach. They had been directed to the area of the "Captain Salty" more than an hour earlier by Officer Martinez, who had been tracking the shrimp boat on radar since about 10:00 in the evening. The officers had maintained a distance initially of three-quarters of a mile and later of two hundred feet from the "Captain Salty" until the time that they approached and boarded the boat. During their wait, the officers had used nightscopes to watch the darkened shrimp boat. They had been able to see one male on the deck of the boat and many piles of large objects. As they neared the "Captain Salty," the officers could detect the smell of marijuana and could see a multitude of burlap bags or bales that were similar in appearance to bags or bales of marijuana they had found during other marijuana investigations. In addition to these bags or bales, the officers found Appellants Acosta, Aniero, Pardon-Gonzalez, Alvarez, Cortes, and Martinez on board the "Captain Salty." Just before he was apprehended, Pardon-Gonzalez threw a briefcase full of papers over the side of the boat into the ocean. The officers also found a C.B. radio tuned to channel four and a ship-to-shore radio. No evidence of fishing or shrimping activity was found.
 
 
 9
 While the officers were securing the "Captain Salty," a small motor boat driven by Appellant Botano approached the shrimp boat and stopped a short distance away. The officers who were then aboard the "Captain Salty" directed their lights on the small boat and saw what appeared to them, based on their experience investigating marijuana offenses, to be marijuana residue in the boat. Botano was then apprehended and brought aboard the "Captain Salty." A C.B. radio was also found in the boat driven by Botano.
 
 
 10
 Upon searching the area just south of the "Captain Salty," the officers found, floating in the ocean, about sixteen more bales of suspected marijuana similar to those on the deck and in the holds of the shrimp boat.
 
 
 11
 As the officers at sea were concluding their discoveries and arrests, the officers on the shore were continuing theirs. After Officer Sutton had placed Soto and Pedroso in custody and the other officers had secured the bales of suspected marijuana found on the beach and in the beached boat, the officers escorted the two men to the beach houses. The beach houses had been approached on the street side by the two officers in the backup assistance vehicle at the same time that the officers on the beach had moved in on the men unloading the small boat. As the officers in the backup vehicle had approached the houses and driven into the driveway, they had seen Appellants Rivero and Quintana standing in the driveway talking with a third male.[2] The three men in the driveway had turned and begun to walk away when they had seen the police vehicle turning into the driveway, and the two officers, after noticing that one of the men held a C.B. radio and had a pistol protruding from the rear pocket of his pants, then told them to halt and apprehended them. The officers confiscated the C.B. and the gun and found that the C.B. was tuned to channel four.
 
 
 12
 Shortly after the men in the driveway were arrested, the officers who had conducted the beach surveillance saw Appellant Lievano walking toward the beach houses. Lievano, who had been watched earlier in the evening for several hours in his position at the water's edge with a Cuban Yo-yo and a radio, was stopped and arrested between the two beach houses. He held a Cuban Yo-yo in his hand and there was a C.B. radio on the ground beside him.
 
 
 13
 At this point, the officers who had arrested the men in the driveway checked the surrounding areas of the beach for additional suspects. They saw the small boat which had been secured during the beach raid and observed another motorboat approaching the shoreline directly behind the two beach houses. When the boat, which was running without any lights on, was within one hundred feet of the shore, the officers tried to hail the vessel, but it immediately turned to a southerly direction and left the area at a high rate of speed. The officers then boarded the boat which had been previously secured and pursued the fleeing vessel. Although they never located the subject of their chase, they did find, in the boat's wake, a few bales of what appeared to them to be marijuana.
 
 
 14
 About twenty or thirty minutes later, at approximately 2:25 a. m. on July 12, a second small motorboat running without navigational lights approached the area of the two beach houses. Officer Kranz, who was alone on the beach, watched the boat land on the beach directly behind one of the houses and saw Appellant Avila disembark and walk towards the two beach houses. Officer Kranz asked the operator of the boat to identify himself; the man answered in Spanish, and Kranz then placed him under arrest. Examination of the interior of the boat driven by Avila revealed residue of a dark brown vegetable-like substance that was similar in appearance to marijuana that Kranz had seen in drug investigations on fifty prior occasions.
 
 
 15
 Our recapitulation of the facts in this case has thus far accounted for the arrests of thirteen of the fifteen appellants. The remaining two, Sosa and Villalba, were apprehended at about 1:30 a. m. on the morning of July 12, 1977, as they drove two vans in an easterly direction on Highway 41. Fifteen or twenty minutes after Officer Kranz issued the "BOLO" for two vans, one red and one tan, traveling together, Officer McCrea spotted a tan van and a red van heading east on Highway 41, with the tan van in front of the red van. Highway 41 is the road which goes east from the Bonita Beach area. McCrea began following the two vans and was later joined by Officer Tomlinson, who had seen a red van and a tan van in the area of the beach houses earlier in the evening. Both officers noticed that the vans appeared to be heavily loaded because the rear bumpers were exceptionally low. Traffic was light at this time of the morning and these were the only mobilized vans seen by the officers since the "BOLO" had been issued. A similar van, blue in color, was found parked in the driveway of one of the beach houses after that area had been secured. A roadblock was set up at the first appropriate location, about twenty miles east of where McCrea had initially seen the vans, and McCrea and Tomlinson followed the vans until they stopped at the roadblock. When the vans came to a halt, the drivers were instructed to get out of the vans and were briefly frisked for weapons. Sosa emerged from the tan van, and Villalba exited from the red one. Sosa's pants were rolled up to his knees and appeared to be damp around the bottom. The officers detected a very strong odor coming from the two vans which they identified, on the basis of their past experience in marijuana investigations, to be the smell of marijuana. They also noticed a piece of burlap on the trailer hitch of the red van. Even though the rear windows of the van were covered with some type of wallpaper, Officer Tomlinson, with the aid of a flashlight, could see packages or bundles wrapped in burlap in the back of the red van. At this point, Sosa and Villalba were arrested.
 
 
 16
 The arrests and seizures made during the evening of July 11 and the morning of July 12, 1977, resulted in the confiscation of over one thousand and fifty bales of suspected marijuana. Eight hundred and forty bales were found aboard the "Captain Salty"; six to eight bales were found on the small boat which was beached behind the two houses and was being unloaded at the time of the raid; four bales were found on the beach behind the two houses; forty-one bales were found inside one of the beach houses;[3] fifty-two bales were found floating in the water in the area of the beach houses and the "Captain Salty"; and one hundred and four bales were found in the two vans driven by Sosa and Villalba. One of the bales seized from the beach area behind the houses was introduced into evidence by the Government; laboratory analysis by the Drug Enforcement Administration established that the bale weighed almost eighty pounds and that the substance comprising the bale was marijuana. All of the officers testified that the bale in evidence was at least similar, if not identical, to the other approximately one thousand and fifty bales that had been seized and later destroyed. Prior to the mass destruction of the total seizure, samples were taken from ten randomly selected bales; laboratory analysis established that these samples were marijuana. The Government also introduced into evidence the residue collected from the small motorboat which was driven by Botano and apprehended as it approached the "Captain Salty"; again, laboratory analysis established that the substance was marijuana.
 
 
 17
 II. The Validity of the Search and Seizure of the Vans
 
 
 18
 Appellants Sosa and Villalba contend that the District Court committed reversible error in denying their motions to suppress evidence of the marijuana found in the vans they were driving. They argue that the police officers were acting on mere suspicion rather than probable cause in making the warrantless search.[4] We must employ a two-fold analysis: (1) whether the officers had reasonable grounds to suspect that Sosa and Villalba were involved in criminal activity, so that an investigative stop was warranted; and, if so, (2) whether probable cause for a warrantless search of the vans developed subsequent to the initial stop.[5] See, e. g., United States v. Michel,588 F.2d 986, 997-999 (5th Cir. 1979); United States v. Wright, 588 F.2d 189, 192-94 (5th Cir. 1979); United States v. Maslanka, 501 F.2d 208, 212-13 (5th Cir. 1974), Cert. denied sub nom. Knight v. United States, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975).
 
 
 19
 In ascertaining whether reasonable suspicion existed, we are concerned only with the facts known to the officers at the time of the stop. United States v. Michel, 588 F.2d at 998; United States v. Rias, 524 F.2d 118, 121 (5th Cir. 1975). Since this case had been under investigation for two weeks and the officers had been in regular communication with one another, particularly on the night of the arrests, we can consider the cumulative knowledge of the officers working on the case, rather than only the knowledge possessed by the officer who made the stop. United States v. Michel,558 F.2d at 998; Moreno-Vallejo v. United States, 414 F.2d 901, 904 (5th Cir. 1969), Cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970).
 
 
 20
 At the time the vans were stopped, the officers knew that a large-scale operation involving what experienced narcotics investigators had identified to be marijuana was underway. Small motorboats were taking bales of marijuana from a large shrimp boat in the Gulf of Mexico to the beach area behind two houses that had been under surveillance for two weeks. One of the officers participating in the investigative stop had observed, earlier in the evening, a red van heading west towards the subject beach houses on the only access road thereto and a beige or light yellow van parked at one of those beach houses. Two obviously heavily laden vans, one red and one tan, were subsequently seen leaving the area and heading east. A "BOLO" was issued for a red van and a tan van, traveling together. The red van driven by Villalba and the tan van driven by Sosa were spotted some fifteen minutes later and were traveling together in an easterly direction on the major road heading east from the Bonita Beach area. The vans appeared to be heavily loaded because their rear bumpers were riding low. At that time of the night, there was very little traffic and no other vans were observed on the roads. A van similar to those in question was seen parked in front of one of the beach houses when that area was secured. In addition, the officers knew from past experience that distributors of large quantities of marijuana often use vans to transport the contraband. These facts, viewed as a whole, amounted at least to suspicion sufficient to allow a lawful investigative stop. See, e. g., United States v. Worthington, 544 F.2d 1275 (5th Cir.), Cert. denied, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977). The manner in which the stop was accomplished was acceptable in light of the circumstances. That is, the use of a roadblock, the instruction to the drivers to get out of the vans, and the brief frisk for weapons were reasonable precautions for the officers to take since two vehicles, traveling together, were to be stopped and a firearm had been found earlier on one of the suspects already apprehended. See United States v. Worthington, 544 F.2d at 1280 n. 3; United States v. Maslanka, 501 F.2d at 213 n. 10.
 
 
 21
 Having determined the initial stop to be lawful, we must now consider whether the remaining sequence of events produced probable cause for a warrantless search of the vans. Immediately after Sosa and Villalba had come to a stop and exited from the vans, the officers saw that the bottom portion of Sosa's rolled up pants legs were damp and smelled the odor of marijuana coming from the vans. At that point probable cause clearly existed for a warrantless search of the vans. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); United States v. Michel, 588 F.2d at 998; United States v. Walker, 522 F.2d 194, 196 (5th Cir. 1975); United States v. Maslanka,501 F.2d at 213.
 
 
 22
 III. The Admission of the Samples of Marijuana into Evidence
 
 
 23
 All of the appellants claim that the samples of marijuana, taken from ten bales which were randomly selected from the total amount confiscated, were improperly admitted into evidence over objection. Their claim is based on the assertion that the Government failed to introduce evidence connecting the samples to this case or to any of the appellants. They claim, in essence, that the samples were inadmissible because the Government failed to show that they were seized from any of the appellants. They point out that the ten randomly selected bales could have been among those found floating in the water. They dispute the source of the samples rather than their chain of custody.
 
 
 24
 It is clear that connection of physical evidence with a defendant may be shown by circumstantial evidence. United States v. White, 569 F.2d 263, 266 (5th Cir. 1978). Furthermore, proof of the connection goes to the weight of the physical evidence rather than its admissibility. Id. There was abundant circumstantial evidence in this case from which the reasonable inference could be drawn that all of the bales which were seized were connected to at least one of the appellants.
 
 
 25
 It was not necessary, however, for the Government to adduce evidence of each defendant's connection to at least one of the samples in order for the samples to be admissible. The District Court found and we agree that the Government had established sufficient evidence to go to the jury concerning a conspiracy related to the marijuana from which the samples came by the time they were offered into evidence. Hence, if the jury found that the conspiracy existed and a defendant was part of it, then the overt act of possession of marijuana by any of his coconspirators in furtherance of the conspiracy would be attributable to that defendant for the purpose of holding him responsible for the substantive offense under either the coconspirator's liability theory of Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), or the aider and abettor's liability as a principal theory of Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). Thus, the samples of marijuana were properly admitted into evidence.
 
 
 26
 IV. The Variance Between the Indictment and the Proof
 
 
 27
 All of the appellants other than Sosa and Villalba contend that "the probata did not meet the allegata." Their argument is that the evidence does not support the crimes charged because every count of the indictment charged a crime "on the high seas" and "in Collier County," while there was no evidence that any appellant had ever been on the high seas or that any appellant other than Sosa and Villalba had been in Collier County.[6]
 
 
 28
 As the Government points out, these appellants fail to note that they were charged with having participated in a conspiracy; thus, it is not essential that every appellant be shown to have committed some act in each location alleged in the indictment. Moreover, the area within which the crime was alleged to have transpired was further defined in the five overt acts listed within Counts I and II. The appellants were therein notified that they were charged with acts committed on the "Captain Salty," in the Gulf of Mexico, off the Coast of Vanderbilt, Florida, off the coast of and on the shore at Bonita Beach, Florida, as well as on Highway 41 in Collier County, Florida. This Court recently restated the three considerations on which the rule that the allegations in an indictment must correspond to the proof at trial is based:
 
 
 29
 (1) that the accused have proper notice of the charges against him; (2) that there be no infringement of the accused's right to be tried only on charges presented in an indictment by grand jury; and (3) that an accused be protected against another prosecution for the same offense.
 
 
 30
 United States v. Tobin, 576 F.2d 687, 695 (5th Cir. 1978). These requirements have all been fulfilled in this case. Cf., United States v. Bass, 562 F.2d 967, 969 (5th Cir. 1977) (indictment's reference to "checks" rather than "sight drafts" insignificant in forgery prosecution).
 
 
 31
 V. The Closing Argument of Counsel for Alvarez and Avila
 
 
 32
 All of the appellants other than Alvarez and Avila contend that the District Court erroneously denied their motions for mistrial when counsel for Alvarez and Avila made a prejudicial statement in his closing argument. The remarks complained of were made at the very beginning of the argument: "Ladies and gentlemen, I submit to you that what happened on July the 12th, 1977, at Bonita Beach and I am not going to insult your intelligence is that there was obviously a smuggling operation going on. And it was obvious that it involved some Cubans." The motions for mistrial were not made, however, until after the conclusion of the summation. This Court has held that a failure to object to the questioned comments when made, if no viable excuse for the omission is offered, entitles the objecting party to relief only if he can show that the remarks, in the context of the trial, amounted to plain error under Rule 52(b) of the Federal Rules of Criminal Procedure. United States v. Ward,481 F.2d 185 (5th Cir. 1973). Examination of the record in this case reveals no plain error. Indeed, the District Court instructed the jury immediately after the motions were made that the attorneys' statements are not evidence to be considered by the jury and that any personal opinions expressed by the attorneys are to be disregarded. Thus, even if an objection were assumed to have been promptly made, this would simply be a case of harmless error because, upon examining the entire record, substantial prejudice to the appellants does not appear. See Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); United States v. Morris, 568 F.2d 396, 400-02 (5th Cir. 1978); Fed.R.Crim.P. 52(a). See also Lakeside v. Oregon, 435 U.S. 333, 340 n.11, 98 S.Ct. 1091, 1095 n.11, 55 L.Ed.2d 319 (1978).
 
 VI. The Sufficiency of the Evidence
 
 33
 All fifteen appellants claim that the evidence adduced by the Government on all four counts was insufficient to support the verdicts rendered by the jury or to withstand their motions for acquittal proffered after the government rested and again at the close of all of the evidence. Because the appellants properly moved for judgments of acquittal, the guilty verdicts may be affirmed if, when considered in the light most favorable to the Government, reasonable minds could have found the evidence to be inconsistent with the hypothesis of the accused's innocence.[7] United States v. Garza, 574 F.2d 298, 304 (5th Cir. 1978); United States v. Duckett, 550 F.2d 1027, 1030 (5th Cir. 1977). With regard to the conspiracy counts, the evidence may be circumstantial or direct, but it must establish beyond a reasonable doubt that a conspiracy existed, that the appellant had knowledge of the conspiracy, and that with such knowledge he performed some act to indicate his participation therein. Id.
 
 A. The Possession Counts
 
 34
 Count II charged the appellants with conspiring to possess marijuana with intent to distribute under 21 U.S.C. § 846. Count III charged them with the substantive offense of possession with intent to distribute under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.
 
 
 35
 With regard to the conspiracy to possess count, the evidence is ample to support the convictions of all of the appellants except for Rivero and Quintana. The appellants attach great significance to the fact that there was no direct, hard evidence of a conspiracy. It is true that none of the defendants chose to "sing" at the trial; thus, there was no testimony by a participant as to the details or evolution of the agreement to commit the crime. There was, however, the testimony of sixteen law enforcement officials who had participated in the investigation and arrests. Their observations are recounted in Part I of this opinion. The evidence introduced by the Government, though circumstantial in nature, yielded a symphonic account of a large scale conspiracy to possess and distribute marijuana. Much of the testimony was the result of the extensive surveillance conducted by the officers and thus provided the jury with corroborated, eyewitness accounts of the events as they transpired. The Government's case succeeded in establishing beyond a reasonable doubt that a conspiracy existed. Although the origin and final destination of the contraband is unknown, since the operation was interrupted somewhere between its beginning and end, it is clear that the plan was to transport the vast amount of marijuana on the "Captain Salty" to the waters just off the coast of Bonita Beach, then to offload the contraband onto smaller motorboats which would transfer the bales to the beach area behind the two beach houses at 1505 and 1506 Hickory Boulevard. Ultimately, the bales were to be transferred inland by way of vans. Some of the contraband apparently came to rest in one of the houses, the permissible inference being that those bales were also to be moved inland before the transaction was completed.
 
 
 36
 That the bales, approximately one thousand and fifty in number, which were seized by the officers did contain marijuana cannot seriously be questioned on appeal. A variety of officers who had participated in numerous marijuana investigations testified that the substance comprising the bales looked and smelled like the marijuana they had seen on previous occasions. Their judgment was confirmed by laboratory analysis of one of the bales seized and of samples taken from ten other randomly selected bales. They further testified that all of the bales were virtually identical in appearance and smell and that marijuana found in previous drug investigations had been similarly packaged. Viewing this evidence in the light most favorable to the Government, the identity of the marijuana was proved beyond a reasonable doubt. See United States v. Crisp, 563 F.2d 1242, 1244 (5th Cir. 1977).
 
 
 37
 With the conspiracy thus established, the appellants' participation in the crime must be established by evidence which a jury could conclude rules out any reasonable hypothesis of innocence. United States v. Alvarez, 548 F.2d 542, 544 (5th Cir. 1977).
 
 
 38
 The presence of appellants Alvarez, Acosta, Pardon-Gonzalez, Aniero, Martinez and Cortes aboard the "Captain Salty" when it was seized and found to contain eight hundred and forty bales of marijuana indicates their participation in the conspiracy. The additional fact that the bales of marijuana were in plain view all over the boat and emanated a strong odor of marijuana, coupled with the inference that bales were off-loaded by those present onto small motorboats during the two hours that the darkened "Captain Salty" was stationary, is evidence enough to exclude any reasonable hypothesis of innocence. The discovery of a C.B. radio tuned to channel four, the same channel to which C.B.'s in other appellants' possession were tuned, is merely added weight, as is Pardon-Gonzalez' act of throwing the briefcase full of papers overboard when the officers boarded the boat.
 
 
 39
 When Appellant Botano approached the darkened shrimp boat and stopped a short distance away at the peculiar hour of 1:30 a. m., he established his presence at the scene of the crime. The presence of marijuana residue and a C.B. radio in his boat is additional proof enough to connect him to the conspiracy.
 
 
 40
 The evidence against Appellants Pedroso and Soto is also of sufficient quantity to sustain their convictions: their presence on the beach where the bales of marijuana were being unloaded from the darkened small boats in the late evening and early morning hours clearly connects them to the conspiring group; the fact that the officers saw them carrying bales from the boats to the houses just before the raid was announced and the men scattered, combined with their panicked flight in the dark directly towards the officers, is ample evidence to establish their participation in the conspiracy.
 
 
 41
 Appellant Lievano's approach of the surveilled beach houses during the wee hours of the morning, and the discovery of a C.B. radio on the ground beside him, shows his presence in the area was related to the conspiracy. Added to his established presence, his actions at the water's edge for several hours earlier in the evening support the inference that he was the "lookout" man and that inference is evidence enough to connect him to the conspiracy.
 
 
 42
 The same conclusion results from an examination of the evidence against Appellant Avila. By the time Avila approached the scene in his boat, three similar boats had been linked with the conspiracy: the first was found on the beach during the raid and contained eight bales of marijuana; the second had been driven by Botano to the waters where the "Captain Salty" was anchored and contained marijuana residue; the third had fled when officers on the beach tried to hail it as it approached the beach behind the houses and bales of marijuana were found floating in its wake. Only twenty minutes later, at approximately 2:30 in the morning, Avila drove a small motorboat, running without navigational lights, to the beach directly behind one of the surveilled houses and beached it there. He was walking towards the two beach houses when he was stopped. He thus indicated a connection between his presence and the conspiracy. The discovery of marijuana residue in his boat combined with his presence yields the evidence necessary to connect him to the conspiracy.
 
 
 43
 The last of those appellants whose convictions for conspiring to possess with intent to distribute marijuana are affirmed are Villalba and Sosa. The presence of their vans in the immediate vicinity of the beach houses just before the bales were unloaded, coupled with the fact that they were seen leaving the area, apparently heavily loaded, while the bales were in the process of being unloaded, establishes their presence in the area of the conspiracy's action. The subsequent discovery of vast amounts of marijuana in their vans, which could be easily smelled from a position outside the vans, resulted in enough evidence to allow the jury to conclude beyond a reasonable doubt that they participated in the conspiracy.
 
 
 44
 The arguments of the foregoing thirteen appellants seek to isolate the threads of their involvement in the conspiracy, so that their actions, viewed alone, might not appear to be significant or criminal. When viewed in the context of the overall fabric of the conspiracy, however, the evidence against them connects them beyond a reasonable doubt to the proven conspiracy and supports the conspiracy convictions. More than mere presence at the scene of the crime has been shown against each of these appellants. See United States v. Littrell, 574 F.2d 828, 832-35 (5th Cir. 1978).
 
 
 45
 With regard to the possession count, the evidence is also sufficient to support the convictions of all of the appellants except for Rivero and Quintana. As related earlier, the evidence shows that the men on the "Captain Salty" (Alvarez, Acosta, Pardon-Gonzalez, Aniero, Martinez, and Cortes), the men on the beach (Pedroso and Soto), and the men driving the vans (Sosa and Villalba) were all apprehended with large amounts of marijuana sufficiently within their domination and control to be in their constructive possession. See United States v. Riggins, 563 F.2d 1264, 1266 (5th Cir. 1977). The vast quantity of contraband involved supplies the foundation for the inference of intent to distribute. E. g., United States v. Raffo, 587 F.2d 199, 201 (5th Cir. 1979). Thus, the conviction of these ten appellants under 21 U.S.C. § 841(a)(1), making illegal any possession of a controlled substance with intent to distribute, and 18 U.S.C. § 2, making illegal aiding and abetting the commission of a federal crime, is clearly supported by the evidence. Although Botano, Lievano, and Avila were not apprehended while in actual physical possession of large amounts of marijuana, much of the same evidence which establishes their participation in the conspiracy also supports a finding that they aided and abetted the others in the possession for which they were convicted. Botano's and Avila's roles as drivers of two of the marijuana "shuttle" boats and Lievano's role as the beach "lookout" man satisfy the requirement in an aiding and abetting prosecution that the defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)). Since we have already decided that the evidence indicates an awareness by these three appellants of the illicit purpose of their actions, their behavior supports the aiding and abetting convictions and renders them punishable as principals for the possession itself. See United States v. Trevino, 556 F.2d 1265, 1269 (5th Cir. 1977).[8]
 
 
 46
 We cannot reach the same conclusions with respect to the convictions of Appellants Rivero and Quintana, however. The evidence shows nothing more than the following: they were found standing in the driveway of one of the beach houses conversing with a third individual who held a C.B. radio tuned to channel four and had a pistol protruding from his pocket; they turned and walked away when the police officers drove into the driveway. There is no evidence that they knew contraband was in the area, much less that they were involved in its possession or in a conspiracy to possess. No marijuana could be seen from their position in front of one of the houses. There were a few other houses in the area which were nonsuspect, so that every reasonable hypothesis of innocence is not excluded by the evidence. It is possible that Rivero and Quintana were merely inquisitive neighbors or passers-by who were in the wrong place at the wrong time. As we noted earlier, mere presence at the scene of the crime will not support a conspiracy conviction. United States v. Littrell, 574 F.2d at 883. Their convictions for possession are unfounded as well, for there is no evidence that they possessed or acted in any manner to aid and abet the possession of marijuana. Hence, the convictions of Rivero and Quintana under 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2 are reversed.
 
 B. The Importation Counts
 
 47
 Count I charged the appellants with conspiring to import marijuana into the United States under 21 U.S.C. § 963. Count IV charged them with the substantive offense of importation under 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 2. As to these charges, the Government's case is too weak to support the conviction of any of the appellants. There is no evidence that the "Captain Salty" ever went outside the territorial waters of the United States or met with any other craft that had. The only evidence which even suggests that the contraband was imported is the size of the shrimp boat and the quantity of marijuana in the cache found to have been transported by the "Captain Salty." The speculation required to get from those facts to convictions on the two importation counts does not provide proper support for the verdicts. See United States v. Maslanka, 501 F.2d 208, 216 (5th Cir. 1974), Cert. denied sub nom. Knight v. United States, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975). Thus, the convictions of all fifteen appellants on these two counts are reversed.
 
 VII. Conclusion
 
 48
 All arguments raised by the appellants having been considered, we reverse the convictions of Rivero and Quintana on all four counts and order the entry of judgments of acquittal;[9] reverse the convictions of the thirteen other appellants on Counts I and IV and order the entry of judgments of acquittal on those counts; and affirm the convictions of those thirteen appellants on Counts II and III.
 
 
 49
 AFFIRMED in part; REVERSED in part.
 
 
 
 [1]
 Since there was no moon and it was very dark that night, the officers on the beach and in the two boats used nightscopes to aid their vision. Nightscopes are devices which allow the users to see in the dark. When one looks through a nightscope, the field of vision appears to be illuminated by a green light
 
 
 [2]
 The man in the driveway who held the C.B. and had a gun in his pocket was not tried with the fifteen appellants in this case. His case was disposed of before their trial and is not before us for review
 
 
 [3]
 The two beach houses which were the subjects of the surveillance are located at 1505 and 1506 Hickory Boulevard. The house at 1506 Hickory Boulevard was briefly searched for security purposes in the early morning hours of July 12, when the appellants in the beach area were arrested; no contraband was found inside the house. The house at 1505 Hickory Boulevard was searched pursuant to a search warrant, shortly before noon on the same day
 
 
 [4]
 The Government contends that this Court should not review the merits of the search argument because Sosa and Villalba waived the right to object by making a knowing and deliberate withdrawal of their pre-trial suppression motions which was permitted with prejudice. Rule 12(b) of the Federal Rules of Criminal Procedure requires that a motion to suppress evidence be raised prior to trial and Rule 12(f) provides that failure to do so constitutes waiver of the objection unless the court "for cause shown" grants relief and allows delayed consideration. When the appellants renewed their motions to suppress during the course of the trial, the District Court considered the motions, notwithstanding their tardiness, on their merits. The appellants had informed the trial judge that their decision to withdraw the pre-trial motion was a tactical move, based on an aspect of the case which could not yet be divulged but would become obvious later. We believe the District Court's desire to proceed and confront the potential Fourth Amendment problems, given the appellants' good faith assurances, constitutes "cause" under Rule 12(f) and is within the District Court's discretion. See United States v. Hall, 565 F.2d 917, 919-20 (5th Cir. 1978). We, therefore, review the contested search
 
 
 [5]
 The appellate court in ruling on the correctness of the trial court's denial of a motion to suppress may consider any evidence presented at the trial of the case and is not limited to the evidence introduced on the hearing on the motion." United States v. Griffin, 555 F.2d 1323, 1326 n. 3 (5th Cir. 1977)
 
 
 [6]
 Bonita Beach is in Lee County, although the Collier County line is less than a mile south of the area. The "Captain Salty" was first seen in Collier County waters, but was apprehended in Lee County waters. The portion of Highway 41 where the vans were apprehended is in Collier County
 
 
 [7]
 A similar standard is applied by the district courts in ruling on a motion for judgment of acquittal, where the court must determine whether, viewing the evidence in the light most favorable to the government, the jury must necessarily entertain a reasonable doubt as to the guilt of the defendant. Thus, our discussion applies with equal force to the propriety of the denials of the motions for judgment of acquittal. United States v. Garza, 574 F.2d 298, 304 n.11 (5th Cir. 1978). Had the appellants failed to renew their motions at the close of all of the evidence, review of the sufficiency of the evidence on appeal would involve merely a determination of whether affirmance of the convictions would entail a manifest miscarriage of justice. United States v. Raffo, 587 F.2d 199, 200 (5th Cir. 1979); United States v. Meneses-Davila, 580 F.2d 888, 896 (5th Cir. 1978)
 
 
 [8]
 The posture of the possession question on appeal is the same in the case at hand as that encountered by this Court in United States v. Trevino, 556 F.2d at 1269 n.5:
 Our treatment of the possession question under the aiding and abetting statute removes the necessity for considering Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), cited by the United States in its brief and noted by both sides on oral argument. The Pinkerton rationale holds one who knowingly joins a conspiracy responsible for all acts committed within the scope of the agreement by any of the conspirators, so long as he has done nothing to disavow or defeat the purpose. The jury in this case was not given a Pinkerton charge but rather was instructed concerning aiding and abetting, an "equally valid" and independent theory, Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919, 925 (1949), and constructive possession. A verdict on the Pinkerton theory requires appropriate instructions to the jury on fact issues, Id., that theory thus is not before us on this appeal.
 
 
 [9]
 Where there is, as a matter of law, insufficient evidence to support a conviction, the direction of a judgment of acquittal is the only "just" remedy available for the reviewing court. Burks v. United States, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978)