UNITED STATES of America, Appellee,

v.

**Charles Martin MOORMAN, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Stephen Talmadge BROCK, Jr., Michael Frederick Lane, Adrian Theodore Lane, Joseph Calvin Gioielli, Paul Pridgen, and Claude David Cook, Jr., Appellants.**

**Nos. 80–5219, 80–5224.**

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1981.

Decided Sept. 24, 1981.

Roy C. Bain, Wilmington, N. C., for appellants in 80–5224.

Joseph B. Cheshire, V, Raleigh, N. C. (Cheshire & Manning, Raleigh, N. C., on brief), for appellant in 80–5219.

Robert Theodore Davis, Jr., Asst. U. S. Atty., Raleigh, N. C. (James L. Blackburn, U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before FIELD, Senior Circuit Judge, and SPROUSE and ERVIN, Circuit Judges.

SPROUSE, Circuit Judge:

Appellants Stephen Brock, Michael Lane, Adrian Lane, Joseph Gioielli, Paul Pridgen, and Claude Cook each were convicted of importation of marijuana and aiding and abetting in the importation of marijuana, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 18 U.S.C. § 2. Appellant Charles Moorman was convicted of aiding and abetting in the importation of marijuana. Each appellant, except Moorman, also was convicted of possession with intent to distribute marijuana and aiding and abetting in possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The appellants principal contention on appeal is that the evidence is not sufficient to sustain their convictions and that the trial court therefore should have granted their motions for judgments of acquittal under Fed.R.Crim.P. 29. Finding these contentions to be without merit, we affirm.

The basic facts are undisputed. On February 24, 1980, federal customs agents received information that two ocean-going vessels, the *Ox* and the *Southern Pride*, would soon pick up a load of marijuana at sea from a third vessel and return with the marijuana to the American Fish Company, a fish house in Southport, North Carolina. Also on February 24, while customs pilot James McCawley was patrolling from the air, he observed the *Jell II*, a freighter, on the high seas about forty miles southeast of Wilmington, North Carolina. The *Jell II* caught McCawley's attention because the vessel appeared to be traveling erratically, in a circular pattern. The United States Coast Guard was informed of the *Jell II*'s activity, and early the next morning the

Coast Guard cutter *Point Marten* approached the *Jell II* and followed her a short distance. Coast Guard officials observed scrape marks about fifteen feet long in the paint of the *Jell II*'s hull. Because the bare metal had not yet rusted, it was apparent that the scrapes were recent.

The cutter's commanding officer had a radio conversation in English with an individual aboard the *Jell II*. Appellant Moorman was the only person aboard the *Jell II* who spoke English. The commanding officer was told that the *Jell II* was a Panamanian vessel bound from Baconquilla, Colombia, to Trenton, New Jersey. Yet, the *Jell II*'s English-speaking crew member did not know the name of any shipyard in Trenton. He stated, moreover, that the *Jell II* had no shipping agent in the United States and that the *Jell II* was carrying no cargo. He granted the Coast Guard officer's request for permission to make a "courtesy boarding" of the *Jell II*.[1]

During the "courtesy boarding," appellant Moorman introduced himself as the *Jell II*'s first mate. Moorman told the Coast Guard officers that the *Jell II*'s master had been injured at sea and had to be put ashore in Georgia. Although Moorman stated the *Jell II* was en route to New Jersey for dry docking, Moorman could not locate any charts of the New Jersey shore aboard his ship. He claimed that the *Jell II*'s master had taken all the ship's documents ashore with him in Georgia. Members of the Coast Guard boarding party observed green vegetable material on the deck of the *Jell II*. They returned to the *Point Marten* with a sample of this material. A field test indicated that it was marijuana.

After securing the permission of the Panamanian government, the Coast Guard on the same day reboarded the *Jell II* and conducted a thorough search. Approximately one hundred bales of marijuana, weighing a total of 3,670 pounds, were

---

1. Appellants do not challenge here the manner in which the Government obtained any of the evidence used against them at trial.

found in the *Jell II*'s cargo hold. Navigational charts of the Gulf of Mexico, Caribbean Sea, and Atlantic Ocean also were discovered. Pencil markings on the charts plotted a course from Colombia through the Antilles and on to the North Carolina coast. The *Jell II* and its contents were seized and its crew members were arrested.

In light of the activity of the *Jell II*, and of the information received on February 24 that the two fishing trawlers, the *Ox* and the *Southern Pride*, would soon be bringing a marijuana shipment to the Southport, North Carolina, fish house, customs officials intensified their surveillance of the fish house area. Customs officials had been watching the fish house for several weeks, believing it to be a "prime smuggling location." Between 8:00 a. m. and 6:00 p. m., the fish house was normally a scene of great activity. Fishing boats would pull in and out of the boat slips; ice would be loaded on boats; quantities of fish would be unloaded and carried into the fish house to be sold. After 6:00 p. m., however, the area was usually deserted.

At about 9:00 p. m. on February 25, 1980, customs officers Moore and Collins observed from their surveillance site a forty-foot fishing trawler docking at the fish house. The establishment was not open for business at that hour, and no other boats or people were around. The agents walked down the dock to the fish house and saw that the trawler was the *Southern Pride*. Judging from the depth of the vessel in the water, the officers deduced that it was laden with cargo. Continuing down the dock, Moore and Collins saw the trawler *Ox* at a loading dock in front of the fish house. Moore left to call for assistance; Collins maintained the surveillance from a parking lot adjacent to the fish house.

Before long, Collins heard a boat engine start. Other customs agents arrived, and from the parking lot they watched the *Ox* travel from the loading dock to a vacant boat slip beside the *Southern Pride*. While the *Ox* was backing into the vacant slip, the agents saw two individuals, later identified as appellants Cook, who was on crutches,

and Pridgen, emerge from the fish house and walk along the dock toward the slip the *Ox* was entering. As the agents approached the *Ox* and the *Southern Pride*, Cook began to walk down the dock, away from the agents. Pridgen walked toward some cars parked in the parking lot near the agents' surveillance site. Agent Christenbury stopped Cook while Officer Moore stopped Pridgen.

Officers Collins and Moore then positioned themselves at the slip next to the *Southern Pride* where the *Ox* was docking. The officers observed two men, later identified as Brock and Gioielli, aboard the *Ox*. Unaware as yet of the officers' identity, Brock and Gioielli threw a line to Collins and Moore, and the two officers helped tie up the *Ox*. Collins and Moore then identified themselves as customs officers. Brock thereupon attempted to leave the *Ox* but was stopped by Moore. Brock went to the other side of the vessel and threw overboard a bale which was later retrieved and identified as consisting of marijuana. According to Officer Moore, both Gioielli and Brock had marijuana residue on their clothing.

Officer Collins and Agent Hill then walked along the dock up to the fish house. Collins claimed at the trial that he "could smell what appeared to be marijuana" as he passed the fish house. Hill testified that he detected "the strong smell of marijuana" when he reached the fish house. Hill looked through a window of the fish house and saw a burlap fertilizer-type bag with the word "Colombia" printed on it. The agents entered the fish house and Hill called out that federal customs agents had arrived. The agents heard a running noise and the slam of a door. Officer Moore and Agent Christenbury saw Adrian Lane and Michael Lane running from the fish house. These two were stopped by Officer Moore. Collins inspected the fish house. There was no fish, ice, or other evidence of recent fishing activity. Collins did see, however, numerous bales of marijuana, totalling, it was later determined, 9,600 pounds.

Collins also inspected the *Ox*. He observed a large quantity of seeds on the deck and green leafy material throughout the trawler. He testified that there was a strong odor of marijuana on board. Collins inspected the *Southern Pride* as well. He again found leafy vegetable material on the deck and around the fish holds. Collins removed the hatch, peered inside the hold, and saw numerous bales of marijuana. The *Southern Pride*, it was determined, contained approximately 4,920 pounds of marijuana.

The upper part of the *Ox*'s hull appeared to have sustained recent damage. Flecks of paint were discovered in the damaged area. A forensic chemist testified that in his opinion the paint flecks found on the *Ox* had come from the *Jell II*. Coast Guard officials aboard the *Point Marten* had noted on February 24 that the *Jell II*'s outside gunwale recently had been scraped.

Appellants Stephen Brock, Michael Lane, Adrian Lane, Joseph Gioielli, Paul Pridgen and Claude Cook were convicted of importation of marijuana and aiding and abetting in the importation of marijuana. Appellant Charles Moorman was convicted of aiding and abetting in the importation of marijuana. All, save Moorman, also were convicted of possession with intent to distribute marijuana and aiding and abetting in possession with intent to distribute marijuana. The trial court denied their motions for judgments of acquittal.

■ We apply the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in reviewing the sufficiency of the evidence upon Rule 29 acquittal motions. *United States v. Shaver*, 651 F.2d 236 (4th Cir. 1981). Applying those principles here, we conclude the convictions must be sustained. To prove the offenses of importation of marijuana and aiding and abetting in the importation of marijuana, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 18 U.S.C. § 2, the Government must prove that marijuana which emanated from a point outside the territorial United States was brought into the territorial United States and that de-

fendants aided and abetted this act. *United States v. Soto*, 591 F.2d 1091, 1104 (5th Cir.), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979).

■ It was undisputed that approximately one hundred bales of marijuana were found in the hold of the *Jell II*, the freighter in Moorman's charge. Moorman admitted the freighter began its voyage in Colombia, and charts found on the vessel marked a course from Colombia to North Carolina. According to uncontroverted expert testimony, paint chips from the recently damaged hull of the *Jell II* were found on the hull of the *Ox*. When the *Ox* was inspected at the Southport, North Carolina, fish house, its deck was strewn with seeds and green leafy material; agents detected a strong marijuana odor. The fish house contained more than eight tons of marijuana. We believe the jury rationally could have concluded beyond a reasonable doubt that the *Jell II* came from Colombia with a load of marijuana and that the *Ox* met the *Jell II* at sea, took on a load of marijuana, and proceeded with it to the North Carolina fish house. This constituted substantial evidence of importation.

■ The jury rationally could conclude beyond a reasonable doubt that Moorman aided and abetted in the importation in his capacity as first mate of a freighter laden with a large quantity of marijuana bound from Colombia to North Carolina. The jury rationally could have discounted his assertion to Coast Guard officers that the *Jell II* was without cargo, en route to New Jersey for dry docking, in light of his lack of knowledge of any New Jersey shipyard, his inability to locate any charts of the New Jersey shore, the presence of the charts marking the course from Colombia to North Carolina, and the large amount of marijuana in the freighter's hold.

■ There was substantial evidence from which the jury rationally could conclude beyond a reasonable doubt that Brock and Gioielli imported marijuana and aided and abetted in the importation: their presence as the only individuals aboard the *Ox* when

it docked at the fish house; the time and setting, the fish house then being closed for business; the attempted flight of Brock, who also threw overboard a bale of marijuana, and the marijuana residue on both men's clothing.

■ Substantial evidence also supports the convictions of Cook and Pridgen for importation and for aiding and abetting in importation. The jury properly could infer guilt from their emergence from the fish house, which contained more than eight tons of marijuana, and their approach to the *Ox* as it was attempting to dock; from the irregularity of their presence at the fish house at night, after the close of business; and from their attempt to leave the scene upon discovery.

The same considerations amply support the convictions of Adrian Lane and Michael Lane, both of whom ran from the marijuana-laden fish house upon discovery by officials.

■ Actual, exclusive possession is not necessary for conviction of possession of marijuana with intent to distribute and aiding and abetting in the possession of marijuana with intent to distribute, under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. A defendant's retention of "an interest in and dominion over" the marijuana constitutes sufficient possession. *United States v. Laughman*, 618 F.2d 1067, 1077 (4th Cir. 1980). "[P]ossession need not be exclusive, but may be shared with others, and is susceptible of proof by circumstantial as well as direct evidence." *Id.*

■ We conclude the evidence is sufficient to support each of the convictions. The proximity of the appellants to the large quantities of marijuana found in the fish house and aboard the *Southern Pride*, coupled with the lateness of the hour, the movements of the *Ox, Southern Pride*, and *Jell II*, and the movements of the appellants at the fish house, all rationally support an inference of a working relationship among several people which, in light of the circumstances, constituted substantial evidence that all had "an interest in and dominion

over" the marijuana. The large amount of marijuana involved supports a rational inference of intent to distribute.

The trial court did not err in denying the acquittal motions.

*AFFIRMED.*