United States Court of Appeals,

Fifth Circuit.

No. 93-5376.

Jill BROWN, Plaintiff-Appellee, Cross-Appellant,

v.

BRYAN COUNTY, OK, et al., Defendants,

Board of the County Commissioners of Bryan County, Oklahoma, et al., Defendants-Appellants, Cross-Appellees.

June 2, 1995.

Appeal from the United States District Court for the Eastern District of Texas.

Before REYNALDO G. GARZA, WIENER, EMILIO M. GARZA, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

A claim for damages was brought against Reserve Deputy Stacy Burns (Burns) and Bryan County, Oklahoma (Bryan County),[1] by Jill Brown (Mrs. Brown) pursuant to 42 U.S.C. § 1983 and Oklahoma law. The case proceeded to trial, in which the jury found in favor of the Plaintiff on every interrogatory submitted. The district court entered a judgment in accordance with the jury's verdict with one exception: Mrs. Brown was not allowed to recover for loss of past income or future earning capacity. Burns and Bryan County (collectively the "Appellants") appeal the judgment against them while Mrs. Brown appeals the portion of the judgment that denied her recovery for lost past income and future earning capacity. For

---

[1]This suit was originally brought against several parties, but the district court dismissed the claims concerning the other Defendants, leaving Bryan County and Stacy Burns as the only Defendants.

1

the reasons stated below we affirm the district court's judgment.

## BACKGROUND

In the early hours of May 12, 1991, Todd Brown (Mr. Brown) and Mrs. Brown were traveling from Grayson County, Texas, to their home in Bryan County, Oklahoma. After crossing into Oklahoma, Mr. Brown, who was driving, noticed a police checkpoint. He decided to avoid the checkpoint and headed back to Texas, allegedly to spend the night at his mother's house. Although the parties offer conflicting stories leading to the pursuit, Deputy Sheriff Robert Morrison (Deputy Morrison) and Burns stated that they "chased" the Browns' vehicle at a high rate of speed before successfully pulling it over. Mr. Brown testified that he was oblivious to the deputies' attempts to overtake him until both vehicles had traveled approximately three miles.[2] By the time the two vehicles eventually stopped, the parties had crossed into Grayson County, Texas, four miles from the Oklahoma checkpoint.

Immediately after exiting the squad car, Deputy Morrison unholstered his weapon, pointed it toward the Browns' vehicle and ordered the occupants to raise their hands. Burns, who was unarmed,[3] rounded the corner of the truck to the passenger's side. After twice ordering Mrs. Brown from the vehicle, Burns pulled her from the seat of the cab and threw her to the ground. Burns

---

[2]Apparently, the road traveled on was winding, thereby, diminishing the visibility of other vehicles approaching from behind.

[3]Although Burns was working for the Sheriff's Department, he was not authorized to carry a firearm or drive a squad car.

employed an "arm bar" technique whereby he grabbed Mrs. Brown's arm at the wrist and elbow, extracted her from the vehicle and spun her to the ground. Mrs. Brown's impact with the ground caused severe injury to her knees, requiring corrective surgery.[4] While Mrs. Brown was pinned to the ground, Burns handcuffed her and left to assist Deputy Morrison in subduing her husband. Mrs. Brown remained handcuffed anywhere from a minimum of thirty minutes to just over an hour.

According to Mrs. Brown's version of the facts, which will be reviewed in greater detail below, the deputies' pursuit and the force consequently applied against her were unprovoked. Furthermore, she claims that her detention constituted false imprisonment and false arrest. Due to the injuries resulting from that encounter, Mrs. Brown seeks compensation from Burns and Bryan County. Mrs. Brown premised the county's liability on two related but distinct policy theories: the hiring of Burns by Sheriff B.J. Moore (Sheriff Moore), the final policymaker for the Sheriff's Department, without adequate screening and Burns' inadequate training.

### DISCUSSION

The Appellants have presented this Court with a host of issues to support their position that the lower court erred. For efficiency's sake, we will address only those points that we

---

[4]Mrs. Brown received a total of four operations on her knees. Moreover, medical testimony was elicited at trial which showed that Mrs. Brown would ultimately require total knee replacements.

believe merit review.  We first address the claims against Burns for the constitutional injuries that Brown suffered.

I.

In their first argument, Burns and Bryan County allege that the force applied against Mrs. Brown was proper.  Appellants claim that the evidence "undisputedly" established that Burns' actions on the morning of May 12, 1991, were objectively reasonable. Therefore, the jury's findings should be reversed.

All claims that a law enforcement officer has used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen, are analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).  The test of reasonableness under the Fourth Amendment requires

> careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* at 396, 109 S.Ct. at 1872.  The "reasonableness" of the particular force used must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight.  *Id.*  In cases implicating excessive force, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.  *Id.* (citation omitted).  Thus, the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying

4

intent or motivation. *Id.* at 397, 109 S.Ct. at 1872.

Determining whether Burns' actions were reasonable depends on whose story the trier of fact accepts as true. According to the testimony of Burns and Deputy Morrison, they were involved in a "high-speed" pursuit[5] after the Browns abruptly turned their truck and sped from the checkpoint. After a four mile "chase" both vehicles came to a full stop. The deputies exited their vehicle and made several commands for the occupants to raise their hands before those commands were obeyed. After rounding the truck, Burns twice ordered Mrs. Brown to exit the vehicle, but she did not comply. He then perceived that she was "lean[ing] forward" in the cab of the truck as if she were "grabbing a gun."[6] He was "scared to death," so he extracted her from the vehicle. He spun her around, dropped her to the ground via the arm bar maneuver and handcuffed her. That was the lowest amount of force he deemed necessary to extract her and ensure he and his partner's safety.

Certainly, Appellants' version of the facts supports a claim that Burns acted reasonably and with an appropriate amount of force. The Browns, however, paint a strikingly different picture. They testified that they were oblivious to the attempts made by the deputies to catch up to them (the Browns) after avoiding the

---

[5]The deputies testified that they were pursuing the Browns at speeds in excess of 100 miles per hour.

[6]The fact that two firearms were found in the truck *after* the arrest does not make Burns actions any more or less reasonable, unless his actions had resulted from the observation of those guns prior to the arrest. That was not the case, however.

5

Oklahoma checkpoint.[7]  Mr. Brown avoided that stop because he feared the possibility of being harassed or unnecessarily detained by the deputies.[8]  He further testified that he did not believe that he turned the truck around either in a reckless fashion nor with wheels squealing or throwing gravel, and that he drove away at a normal rate of speed.  Finally realizing that they were being pursued, Mr. Brown pulled over only to find a gun pointed at him.  They were ordered to put their hands up and they did so.

Mrs. Brown then testified that Burns ran to her side of the vehicle and ordered her to get out.  She was paralyzed with fear and heard Burns repeat the command.  According to her testimony, however, she was not slow in responding to Burns' orders and she did not make any sudden moves while exiting the vehicle.  Her only forward movement was to exit the truck and, contrary to Burns' testimony, she did not reach for anything.  Then, while she was exiting the truck, Burns suddenly grabbed her arm, yanked her out, spun her around and threw her to the pavement.  She could not break her fall because one arm was raised and Burns firmly gripped the other.

In addition to this conflicting testimony, both sides elicited expert testimony concerning the reasonableness of Burns'

---

[7]Mr. Brown testified that initially, he did not hear any police sirens, or observe a squad car following them.  Finally, after driving for several minutes at speeds of 40 to 55 miles per hour, he glimpsed the blue lights from the deputies' vehicle and determined that he was being pursued.  He stopped the truck at the first available opportunity.

[8]Mr. Brown alleged that he had been unnecessarily detained at that checkpoint on several occasions.

actions.  Mrs. Brown's expert, for example, concluded that the force applied by Burns in this situation was unjustified and excessive.[9]  The jury weighed all the evidence, evaluated the conflicting testimony and rendered a verdict in Mrs. Brown's favor. Under our standard of review,[10] when the evidence supports the verdict, this Court will not impose its own opinion in contravention to the jury's.  Therefore, we will not interfere with the fact finder's conclusion that Burns' actions were unreasonable and that the force he used was excessive.

## II.

Notwithstanding the jury's findings, Appellants also assert

---

[9]The expert did acknowledge that the force used was the lowest force that could have been applied in extracting and subduing an arrestee without endangering either party.  However, he did not feel that the situation required this type of force.

[10]The standard for appellate review of a jury's verdict is exacting.  *Granberry v. O'Barr,* 866 F.2d 112, 113 (5th Cir.1988). It is the same standard as applied in awarding a directed verdict or a judgment notwithstanding the verdict and is referred to as the "sufficiency of the evidence" standard.  *Id.*  The standard is as follows:

> "The verdict must be upheld unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary.  If there is evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the jury function may not be invaded."

*Id.* (quoting *Western Co. of North Am. v. United States,* 699 F.2d 264, 276 (5th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) ).  Stated another way, the Court should consider all of the evidence, not just that evidence which supports the nonmovant's case, in the light and with all reasonable inferences most favorable to the nonmovant.  *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).

that there was probable cause to arrest Mrs. Brown. They argue that the facts justified Burn's actions, thereby precluding Mrs. Brown's § 1983 claim for false arrest.

There is no cause of action for false arrest under § 1983 unless the arresting officer lacked probable cause. *Fields v. City of South Houston, Tex.,* 922 F.2d 1183, 1189 (5th Cir.1991). To determine the presence or absence of probable cause, one must consider the totality of the circumstances surrounding the arrest. *United States v. Maslanka,* 501 F.2d 208, 212 (5th Cir.1974),[11] *cert. denied,* 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975). Whether officers have probable cause depends on whether, at the time of the arrest, the " "facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the arrested] had committed or was committing an offense.' " *Id.* (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). Furthermore, although flight alone will not provide probable cause that a crime is being committed, in appropriate circumstances it may supply the " "key ingredient justifying the decision of a law enforcement officer to take action.' " *United States v. Bowles,* 625 F.2d 526, 535 (5th Cir.1980) (quoting *United States v. Vasquez,* 534 F.2d 1142, 1145

---

[11]In *Maslanka,* a police officer observed a car coming down a road and, upon seeing his unmarked car, it turned around and sped away in flight. This Court found that this observation provided sufficient facts for an officer to investigate. *Maslanka,* 501 F.2d at 213. Upon stopping the car, the officer smelled marihuana smoke, creating the probable cause necessary to arrest the passengers. *Id.*

8

(5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976)).

To reiterate, whether Burns had probable cause to arrest Mrs. Brown depends in large part on whether the facts, as Burns knew them, were sufficient to warrant a prudent man's belief that Mrs. Brown committed or was in the process of committing a crime. The facts material to that determination were hotly contested, especially the contradictory testimony relating to the pursuit and Mrs. Brown's movements while exiting the vehicle. Thus, it was for the fact finder to determine whether Burns had probable cause to arrest Mrs. Brown. *Harper v. Harris County, Tex.,* 21 F.3d 597, 602 (5th Cir.1994). Assuming *arguendo* that the deputies had a reasonable suspicion to perform an investigatory stop, we nevertheless find the evidence sufficient to support the jury's finding that Burns did not have probable cause to arrest Mrs. Brown, and that his doing so violated her constitutional right to be free from false arrest.

As the jury found that Burns did not have probable cause to detain or arrest Mrs. Brown, it could also find from the evidence that she was falsely imprisoned. To set out a claim for false imprisonment the plaintiff must prove (1) an intent to confine, (2) acts resulting in confinement, and (3) consciousness of the victim of confinement or resulting harm. *Harper v. Merckle,* 638 F.2d 848, 860 (5th Cir. Unit B Mar.), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). Under § 1983, the plaintiff must also prove the deprivation of a constitutional right, i.e., an

9

illegality under color of state law.  *Id.*  The evidence establishes that Mrs. Brown believed herself to be under arrest:  even though she had committed no crime, she remained handcuffed for approximately an hour before being released, during which time she was never informed of the nature of the charges for which she was being detained, and subsequently no charges were ever brought.  In light of such evidence, a finding of false imprisonment is proper.[12]

### III.

Appellants also contest the jury's finding that Burns was not entitled to qualified immunity.  A proper analysis of a qualified immunity defense requires us to conduct a two (sometimes three) prong inquiry.  *See Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991);  *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  First, we determine "whether the plaintiff has asserted a violation of a constitutional right at all."  *Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793. Second, we ascertain whether the law was clearly established at the time of the official's action.  *Siegert,* 500 U.S. at 233-34, 111 S.Ct. at 1794;  *Harlow,* 457 U.S. at 815-19, 102 S.Ct. at 2737-38. Third, we evaluate the "objective reasonableness of [the] official's conduct as measured by reference to clearly established law."  *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2739.  It is clear that by 1991, use of excessive force, false arrest and false imprisonment had been held to violate citizens' constitutional

---

[12]As this Court finds that liability was proper for the claims of excessive force, false arrest and false imprisonment, it need not address the state law issues involved herein.

rights, thus the qualified immunity defense fails if Burns did not act with probable cause. As the trier of fact determined that Burns did not have probable cause to arrest Mrs. Burns, he is not entitled to qualified immunity.[13]

## IV.

Burns asserts that the evidence is insufficient to support the jury's award of punitive damages. He argues that application of the arm bar technique did not rise to a level of "flagrant" conduct and further, that it did not evidence malice or give rise to an inference of evil intent.[14] Nevertheless, the Supreme Court has ruled that punitive damages are recoverable in a § 1983 action. *Smith v. Wade,* 461 U.S. 30, 35, 103 S.Ct. 1625, 1629, 75 L.Ed.2d 632 (1983). One of the primary reasons for § 1983 actions and punitive damages is to deter future egregious conduct. *Id.* at 49, 103 S.Ct. at 1636. A jury may assess punitive damages in an action under § 1983 if the defendant's conduct is shown to be motivated by evil motive or intent, or involved reckless or callous indifference to the federally protected rights of others. *Id.* at 56, 103 S.Ct. at 1640. The question is whether the acts of Burns, which caused the deprivation of Mrs. Brown's constitutional rights, rose to a level warranting the imposition of punitive damages. In light of

---

[13]"While it is correct that the reasonableness of the arresting officer's conduct under the circumstances is a question of law for the court to decide, such is not the case where there exist material factual disputes...." *Harper v. Harris County, Tex.,* 21 F.3d 597, 602 (5th Cir.1994) (discussing officer's qualified immunity).

[14]Mrs. Brown did not respond to this argument in her briefs.

11

the evidence before it, we believe that the jury could properly infer that Burns' acts were unjustified and that he acted with callous or reckless indifference to Mrs. Brown's constitutional rights.  Therefore, punitive damages were justified.

V.

On cross-appeal, Mrs. Brown argues that it was error for the district court to grant Appellants' Motion for Judgment Notwithstanding the Jury Verdict (JNOV) as it relates to her claims for loss of past income and future earning capacity.[15]  Mrs. Brown asserts that neither Bryan County nor Burns specifically raised an issue concerning the sufficiency of the evidence supporting that portion of the judgment, thus the district court's action was unjustified and the award must be reinstated.  She insists that there is absolutely no legal predicate on which the district court could base its actions.  Therefore, as evidence was offered to support this award, Mrs. Brown argues that the original jury award should be reinstated.

This Court has determined that it "would be a constitutionally impermissible re-examination of the jury's verdict for the district court [or this Court] to enter judgment n.o.v. on a ground not raised in the motion for directed verdict." *McCann v. Texas City*

---

[15]In the order, the district court stated "[t]he jury awarded plaintiff substantial damages in this case, including $36,000 for loss of income in the past and $180,000 for loss of earning capacity in the future.  After a review of the evidence in this case, the Court is convinced that there is no legally sufficient evidentiary basis for the award of these damages. Therefore, judgment should be granted for the defendants on plaintiff's claims for loss of income in the past and loss of earning capacity in the future."

*Refining, Inc.,* 984 F.2d 667, 672 (5th Cir.1993). It is undisputed that the Appellants did not address the sufficiency of the evidence supporting the jury's award for loss of past income and future earning capacity in their motions for either directed verdict or JNOV. Thus, the lower court should not have decided whether sufficient evidence exists to support this award. However, as the Appellants point out, Mrs. Brown failed to object to this error at trial, and it is the "unwavering rule in this Circuit that issues raised for the first time on appeal are reviewed only for plain error." *Id.* In other words, this Court will reverse only if the error complained of results in a "manifest miscarriage of justice." *Id.* Furthermore, contrary to Mrs. Brown's contention, the issue is not whether *any* evidence exists to support the jury verdict. Instead, the issue is whether the district court's action constituted plain error.

Upon reviewing the record, we do not believe that the lower court's error resulted in a manifest miscarriage of justice. The only evidence offered in support of the award comprised of Mrs. Brown's testimony, which reflected that she had accepted an offer to commence work a few days after the day of the incident. Her compensation would have been measured on a commission basis, which she believed would have paid between $1,500 to $1,800 a month. The district court's ruling that this evidence was lacking does not arise to plain error. Mrs. Brown's failure to object at the appropriate time denied the district court the opportunity to rectify any errors. Therefore, the court's ruling will stand.

13

VI.

Having found that Burns violated Mrs. Brown's constitutional rights, the next inquiry concerns the possible liability of Bryan County. It is well established that in a § 1983 action, liability may not be imposed on a government entity on a theory of *respondeat superior* for the actions of nonpolicymaking government employees. *Monell v. Dep't of Social Servs. of New York,* 436 U.S. 658, 690-94, 98 S.Ct. 2018, 2035-37, 56 L.Ed.2d 611 (1978). In certain instances, however, a municipality may incur § 1983 liability for its employees' actions when an official policy or custom of hiring or training causes those actions. *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992). To prove that a municipal hiring or training policy violated an individual's rights, the plaintiff must show that (1) the hiring or training procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent to the constitutional rights of the citizens in adopting the hiring or training policy; and (3) the inadequate hiring or training policy directly caused the plaintiff's injury. *Id.* (citing *City of Canton v. Harris,* 489 U.S. 378, 390-392, 109 S.Ct. 1197, 1205-1206, 103 L.Ed.2d 412 (1989)).

Liability will accrue for the acts of a municipal official when the official possesses "final policymaking authority" to establish municipal policy with respect to the conduct that resulted in a violation of constitutional rights. *Pembaur v. City*

14

*of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (plurality opinion). Municipal liability is limited to "acts that are, properly speaking, acts "of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480, 106 S.Ct. at 1298. The mere exercise of discretion by a county official will not be sufficient, by itself, to generate municipal liability:

> The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Id.* at 481-483, 106 S.Ct. at 1299-1300.

Bryan County has all but conceded that Sheriff Moore alone set all policies involving the conduct and operation of his office.[16] In fact, Appellants even stipulated that Sheriff Moore was the final policymaker for the Sheriff's Department. As such, it is patently clear that Sheriff Moore is an official "whose acts or edicts may fairly be said to represent official policy and whose decisions therefore may give rise to municipal liability under § 1983." *Id.* at 480, 106 S.Ct. at 1299 (citing *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037).

---

[16]In the pre-trial order, Appellants' ask "[w]hether Defendant Board of County Commissioners is liable under 42 U.S.C. § 1983 when they did not participate in any policy decisions with regards to the conduct and operation of the office of Bryan County Sheriff?" Appellants also failed to object to the jury instructions which referred to Sheriff Moore as the final policymaker. *See Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 754 (5th Cir.1993) (failure to lodge an objection to court's instructions regarding the final policymaker waived the issue).

15

Mrs. Brown maintains that her injuries resulted from two "policies" chosen by Sheriff Moore in his official capacity as the final policymaker in the Sheriff's Department.[17] The first purported policy is Sheriff Moore's decision to hire Burns without conducting an adequate background investigation. The other policy is Sheriff Moore's decision to provide Burns with minimal training and preparation for his duties as a peace officer before permitting him to act in that capacity. Thus, Mrs. Brown argues that a municipality can be held liable under § 1983 based on a final policymaker's single decision regarding the hiring or training of one individual. Appellants, on the other hand, argue that § 1983 liability cannot attach on the basis of a policymaker's single, isolated decision to hire or train one individual.

An argument similar to the Appellants' was rejected by this Court in *Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 754 (5th Cir.1993). In *Gonzalez,* the Ysleta Independent School District (YISD) was sued for a single decision to transfer a teacher accused of sexually harassing a student, rather than removing him from the classroom. YISD argued that this ad hoc, isolated decision, even when made by policymakers, did not constitute the sort of "policy" upon which municipal liability could be predicated under *Monell.* This was especially true there,

---

[17]Mrs. Brown distinguishes her "policy" claims from "custom" claims and notes that she could not recover on the latter theory because her injuries were the result of either of two single decisions: Sheriff Moore's decision to hire Burns or his decision to train Burns inadequately. The injuries, therefore, were not caused by a widespread practice or procedure of inadequately hiring or training personnel.

16

insisted YISD, as the decision was contrary to the district's own formal policy for handling such matters. This argument proved unpersuasive.

The term "policy" is distinguished from custom as follows: policy is defined as a "policy statement, ordinance, regulation, or **decision** officially adopted and promulgated by a [municipality's officers]," while custom consists of "persistent and widespread ... practices of ... officials." *Monell,* 436 U.S. at 690-91, 98 S.Ct. at 2036 (emphasis added).[18] "Policy" often refers to formal rules and understandings, but its meaning is not exhausted by " "fixed plans of actions to be followed under similar circumstances consistently and over time.' " *Gonzalez,* 996 F.2d at 754 (quoting *Pembaur,* 475 U.S. at 480-81, 106 S.Ct. at 1299). "To the contrary, it is well established that a municipality may be held liable for "course[s] of action tailored to a specific situation and not

---

[18]*Accord Johnson v. Moore,* 958 F.2d 92 (5th Cir.1992). In *Moore,* this Court defined policy and custom as:

> 1. A policy statement, ordinance, regulation, or **decision** that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Id.* at 94 (citing *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc) (emphasis added), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985) ).

17

intended to control decisions in later situations,' *provided* that the "decision to adopt that particular course of action is properly made by that government's authorized decisionmakers.' " *Id.* (quoting *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299) (emphasis added). Additionally, the existence of a well-established, officially adopted policy will not insulate the municipality from liability where a policymaker departs from these formal rules. *See, e.g., St. Louis v. Praprotnik,* 485 U.S. 112, 122-126, 108 S.Ct. 915, 923-925, 99 L.Ed.2d 107 (1988) (plurality opinion).

Based on the facts before it, the *Gonzalez* panel concluded that the final policymaker's single, conscious decision, i.e., the Board of Trustee's decision to transfer the teacher rather than remove him from the classroom, constituted a "policy" attributable to the school district. *Gonzalez,* 996 F.2d at 754. This conclusion was logical, as "[n]o one has ever doubted ... that a municipality may be liable under § 1983 for a *single decision* by its properly constituted legislative body ... because even a single decision by such a body unquestionably constitutes an act of official government policy." *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1298 (emphasis added).[19] To deny compensation to the victim in

---

[19]In *Pembaur,* the Supreme Court held that a county prosecutor's single decision, ordering law officers to forcibly enter a dentist's office, was actionable under § 1983. 475 U.S. at 480-81, 106 S.Ct. at 1298-99. However, the Court cautioned that liability would only attach where the course of action was deliberately chosen by a decisionmaker possessing final authority to establish municipal policy. *Id.* at 481, 106 S.Ct. at 1299. We note that Mr. Pembaur's § 1983 action was premised on a theory of municipal policy and not on a theory of municipal custom. *Id.* n. 10.

such a case would be contrary to the fundamental purpose of § 1983. *Id.* at 481, 106 S.Ct. at 1299. So, it is clear that a single decision may create municipal liability *if* that decision were made by a final policymaker responsible for that activity.

Bryan County, however, further contends that a pattern of repeated injuries must develop before municipal liability can accrue against it. This Court is aware of the case law in this Circuit stating that "[i]solated violations are not the persistent, often repeated constant violations that constitute custom and policy" as required for § 1983 liability. *See, e.g., Bennett v. City of Slidell,* 728 F.2d 762, 768 n. 3 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); *Fraire v. City of Arlington,* 957 F.2d 1268 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992). Similarly, the first case in the lineage of *Monell, City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), also indicated that a *single incident* of unconstitutional activity will not suffice to hold a municipality liable under *Monell* "*unless* proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Id.* at 823-24, 105 S.Ct. at 2436. Thus, once an unconstitutional policy is established, " "it requires only one application ... to satisfy fully *Monell* 's requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.' " *Pembaur v. City of Cincinnati,*

475 U.S. 469, 478 n. 6, 106 S.Ct. 1292, 1297 n. 6, 89 L.Ed.2d 452 (1986) (quoting *Tuttle,* 471 U.S. at 822, 105 S.Ct. at 2435).

But "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy' and the constitutional deprivation." *Tuttle,* 471 U.S. at 824, 105 S.Ct. at 2436 (citations omitted). Thus, the Supreme Court envisioned only two types of policies: constitutional and unconstitutional. Of course, the Court's logic is irrefutable, as a policy either is or is not constitutional. However, when determining whether or not more than one incident is needed to impose liability, we believe that the distinction between policies that are unconstitutional, that is, policies that require or compel violations, and otherwise constitutional policies, is "metaphysical."[20] In certain cases, the facts may undoubtedly fall somewhere in between.

In *Gonzalez* we recognized that a single constitutional decision can constitute an unconstitutional policy if the causal link between the decision and the unconstitutional result is too compelling to ignore. As explained below, the hiring decision made by *the* final policymaker for the Sheriff's Department—not merely a

---

[20]*See Gonzalez,* 996 F.2d at 754-55 (discussing "metaphysical" distinction (quoting *Tuttle,* 471 U.S. at 833 n. 8, 105 S.Ct. at 2441 n. 8 (Brennan, J., concurring in part))). It is only in the latter case, i.e., where a policy is otherwise constitutional, where more than one incident or violation must be shown to have occurred.

non-policymaking county employee—created a high likelihood that a citizen's constitutional rights would be violated. Consequently, as we deem such decision to be unconstitutional, a single application of that invalid policy, i.e., the hiring of Burns, is sufficient to satisfy *Monell.*

Furthermore, we note that the primary reason for requiring a "pattern" of violations before imposing municipal liability is to alert the final policymakers of deficiencies in municipal programs or practices.[21]  So, once the final policymakers are actually or constructively aware of any problem areas, they can take the necessary corrective measures.  If they fail to take such measures, the government entity itself can be held liable, but *only* if the citizen can *also* prove that this failure was due to the deliberate indifference of the policymakers and that the policy itself caused the injuries.

As the final policymaker for the Sheriff's Department, Sheriff Moore was conscious of his own policy decision and was thus aware or deliberately indifferent to its inadequacy.  Thus, if Mrs. Brown proves the necessary "deliberate indifference" and "causation" elements, we need not wait for Sheriff Moore to hire several other

---

[21]*See Bennett v. City of Slidell,* 728 F.2d 762, 768 (5th Cir.1984) ("Sufficient duration or frequency of abusive practices, or other evidence, must warrant a finding of knowledge on the part of the governing body that the objectionable conduct has become customary practice of city employees.  Where the violations are flagrant or severe, the fact finder *will likely require a shorter pattern of the conduct* to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation."), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985) (emphasis added).

21

unqualified applicants, and wait for other citizens' rights to be violated, before section 1983 liability can be imposed.

A.

Mrs. Brown argues that Burns' lengthy criminal history should have prevented Sheriff Moore from hiring him. Burns' history revealed a string of offenses that, she claims, demonstrates a disregard for the law and a propensity for violence. Moreover, she maintains that a thorough investigation of Burns' background would have revealed that his parole had been violated by his numerous offenses. Thus, she argues that Burns' screening and subsequent employment by Sheriff Moore were inadequate and subjected Bryan County to liability.

As explained above, in inadequate hiring cases the plaintiff must show that (1) the hiring procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the hiring policy; and (3) the inadequate hiring policy directly caused the plaintiff's injury. *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir.) (citing *City of Canton v. Harris,* 489 U.S. 378, 390-392, 109 S.Ct. 1197, 1205-1206, 103 L.Ed.2d 412 (1989)), *cert. denied,* --- U.S. ----, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992). In analyzing the first element, i.e., whether Sheriff Moore's decision to hire Burns was adequate, we turn to *Stokes v. Bullins,* 844 F.2d 269 (5th Cir.1988), for guidance.

The plaintiff in *Stokes,* who was shot by a police officer, sought to impose liability against the town that had hired the

22

officer, on grounds that it had failed to establish adequate policies for hiring its police officers. To establish that the town's hiring "policy" was inadequate, the plaintiff relied on one allegedly inadequate hiring decision, i.e., the decision by the town to employ the officer who shot the plaintiff, even though the town's mayor and an alderman were aware that the officer had previously been arrested for several minor offenses in nearby towns. The known arrests were thoroughly investigated, but the town failed to conduct a National Crime Information Center (NCIC) computer search, which would have revealed a criminal history of approximately fifteen arrests, on charges ranging from simple assault to armed robbery. After reviewing these facts, the district court concluded that the failure to perform a NCIC check constituted gross negligence and conscious indifference to the public's welfare.

This Court disagreed with the lower court's ruling and refused to make performance of a NCIC check a constitutional requirement in assessing municipal liability. *Id.* at 275; *see Benavides,* 955 F.2d at 975. Nonetheless, the Court stated that,

> [we do not] imply that a municipality may close its eyes to the background of those seeking employment with it. *If* a § 1983 claim may arise from egregious hiring practices, however, we would analogize with [*Languirand v. Hayden,* 717 F.2d 220 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984) ], and require a plaintiff to establish actual knowledge of the seriously deficient character of an applicant *or* a persistent, widespread pattern of the hiring of policemen, for instance, with a background of unjustified violence.

*Stokes,* 844 F.2d at 275 n. 9 (original emphasis).

This passage is crucial to our analysis because in it we

recognize that a policymaker's wrongful hiring of one deficient individual can result in municipal liability. Moreover, it cautions that an applicant must not be hired blindly by a municipal entity.

In *Benavides,* this Court reviewed *Stokes* where, as mentioned above, the Court focused on the town's investigation of the applicant's prior employment history and his arrests for relatively trivial offenses before determining that the town was not deliberately indifferent in hiring the officer. *Benavides,* 955 F.2d at 975 (discussing *Stokes*—"The town's good faith hiring effort was adequately demonstrated by its review of the applicant's employment history and its review of those arrests that were brought to its attention."). Turning to the facts before it, the *Benavides* court likewise concluded that the governmental entity was not liable for its hiring policy, as the policymaker authorized to make hiring decisions conducted a good faith investigation into the applicant's background. Therefore, as long as a municipality's hiring decision was based on a *good faith* investigation of the applicant's known arrest record and background, no further investigation is required to shield the municipality from § 1983 liability. In light of the teachings in *Stokes* and *Benavides,* we now turn to the facts before us.

Mrs. Brown does not premise her suit on a theory that Bryan County had a "widespread pattern" of hiring deficient policemen. Instead, she argues that Sheriff Moore's decision to hire a single, deficient applicant formed the basis for Bryan County's liability.

24

In view of the authorities cited above, we believe that the decision to hire this single applicant gave rise to municipal liability.[22] Liability will attach, however, only if the jury could infer from the evidence at trial that Sheriff Moore did not conduct a good faith screening and investigation of the applicant, thus leading to an inadequate hiring decision.

During the application process Sheriff Moore ordered a printout of Burns' criminal record, which revealed the following citations and arrests:  nine moving traffic violations, Actual Physical Control (APC) of a motor vehicle while intoxicated, driving with a suspended license, arrest for assault and battery, conviction for possession of a false identification and an arrest for resisting lawful arrest.  When Sheriff Moore was examined about Burns' "rap sheet," the following exchange took place:

Q. Did you make an inquiry with the proper authorities in Oklahoma to get a copy of Mr. Burns' rap sheet?

A. I run his driving record, yes.

Q. All right.  And you can get that rap sheet immediately, can't you?

A. It don't take long.

Q. All right.  And did you not see on there where Mr. Burns had been arrested for assault and battery?  Did you see that one on there?

---

[22]Of course, the appellee must also prove that the policy which produced or caused the unconstitutional violation resulted from the *deliberate indifference* of a final policymaker. *Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 757-59 (5th Cir.1993).  The court in *Gonzalez* ultimately determined that YISD was not liable to the plaintiff because the evidence did not show that the Board of Trustees acted with deliberate indifference. *Id.* at 762.

A. I never noticed it, no.

Q. Did you notice on there he'd been arrested or charged with [Driving While License Suspended] on several occasions?

        \*    \*    \*

A. I'm sure I did.

Q. All right.  Did you notice on there that he'd been arrested and convicted for possession of false identification?

A. No, I never noticed that.

Q. Did you notice on there where he had been arrested for public drunk?

A. He had a long record.

Q. Did you notice on there where he had been arrested for resisting arrest?

A. No, I didn't.

Q. Did you make any inquiries after you got that information to determine exactly what the disposition of those charges were?

A. No, I didn't.

Q. Did you not make any attempt to find out the status of Mr. Burns' criminal record at that time?

A. As far as him having a criminal record, I don't believe he had a criminal record.  It was just all driving and—most of it was, misdemeanors.

Q. Well, did you make any attempts to determine whether or not Mr. Burns was on probation at the time you placed him out there?

A. I didn't know he was on probation, no.

Q. Did you make any effort to find out?

A. I didn't have no idea he was on probation, no.

Q. Well, you saw on his rap sheet where he had been charged with [Driving Under the Influence], didn't you?

A. I had heard about that.  I don't remember whether I had seen it on the rap sheet or not.

Q. So you'd heard about it?

26

                            *    *    *

A. I don't remember whether I seen it on the rap sheet or heard
   about it.

    Besides this damaging testimony, Mrs. Brown's expert[23]
testified regarding the importance of properly screening law
enforcement applicants.  The expert testified that a thorough
investigation process is needed to weed out individuals who enter
the police force for the wrong reasons, for example, because "they
like to exert their power."  In light of Burns' arrest record, the
expert concluded that he showed a "blatant disregard for the law
and problems that may show themselves in abusing the public or
using excessive force," thereby rendering Burns unqualified for a
position in law enforcement.  The expert further testified that as
a minimum, Sheriff Moore should have investigated the disposition
of the charges against Burns.  Even Appellants' expert, Ken Barnes,
agreed that Burns' criminal history should have caused some
concern, meriting a further review of the applicant.  More
importantly, when Mr. Barnes was asked if he would have hired
Burns, he replied that it was "doubtful."

    From the foregoing evidence, the jury could have reasonably
inferred that Sheriff Moore "closed his eyes" to Burns' background
when hiring him.  This inference is reinforced by Burns' familial
relations within the Sheriff's Department:  not only is Burns the

---

    [23]The record shows that the expert, Dr. Otto Schweizer, had
spent over twenty years in law enforcement, including, several
years as a field training officer, a police chief and as a
professor of criminal justice and police administration at the
University of Central Oklahoma.

                              27

son of Sheriff Moore's nephew, but Burns' grandfather had been involved with the department for more than sixteen years. Alternatively, the jury could have inferred that Sheriff Moore was indeed aware of Burns' past problems with the law and was therefore cognizant of his deficient character, but nevertheless opted to employ him because he was "family".[24]   Again, the innuendos of nepotism only bolster the inference that Burns would have been hired *regardless* of his criminal history.

We believe that the evidence supports the jury's conclusion that Sheriff Moore did not conduct a good faith investigation of Burns.  Although it is true that Sheriff Moore ran a NCIC check of Burns, this action was futile given that Burns' arrest history was all but ignored.  Sheriff Moore conceded that Burns' record was so long that he did not bother to examine it.  And, except for this feeble attempt to screen him, no other effort was made to investigate Burns.  A further examination would have revealed that Burns had repeatedly violated probation, and that a warrant was subsequently issued for his arrest.  In light of this history, it should have been obvious to Sheriff Moore that a further investigation of Burns was necessary.

We also find the evidence sufficient for a jury to conclude that Sheriff Moore's decision to hire Burns amounted to deliberate

---

[24]In light of the string of arrests and convictions, a jury could properly conclude that Burns had a propensity for violence and a disregard for the law, thus, precluding his employment.  We deem such a conclusion proper, even though Burns had no felonies on his record.  Oklahoma law prevents a sheriff from hiring an individual convicted of a felony or a crime involving moral turpitude.  OKLA.STAT.ANN. tit. 70, § 3311(d)(2) (West 1994).

28

indifference to the public's welfare. *See Stokes v. Bullins,* 844 F.2d 269, 275 (5th Cir.1988); *Wassum v. City of Bellaire, Texas,* 861 F.2d 453, 456 (5th Cir.1988); *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992). In light of the law enforcement duties assigned to deputies, the obvious need for a thorough and good faith investigation of Burns, and the equally obvious fact that inadequate screening of a deputy could likely result in the violation of citizens' constitutional rights, Sheriff Moore can reasonably be said to have acted with deliberate indifference to the public's welfare when he hired Burns. *See City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).[25] The failure to conduct a good faith investigation of the prospective employee amounted to Sheriff Moore deliberately closing his eyes to the Burns' background.[26] Such indifferent behavior cannot be tolerated when the prospective applicant will be employed in a position of trust and authority.

---

[25]Further, the lower court's charge to the jury was proper: "Sheriff B.J. Moore would have acted with deliberate indifference in adopting an otherwise constitutional hiring policy for a deputy sheriff if the need for closer scrutiny of Stacy Burns' background was so obvious and the inadequacy of the scrutiny given so likely to result in violations of constitutional rights, that Sheriff B.J. Moore can be reasonably said to have been deliberately indifferent to the constitutional needs of the Plaintiff."

[26]It is certainly true that the Sheriff had conducted adequate background checks on other deputies and assured himself that they were certified before putting them on the street, but the fact that he diverged from that practice as to this one individual does not save Bryan County from liability. *See Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 754 (5th Cir.1993).

Additionally, the jury could find that hiring an unqualified applicant and authorizing him to make forcible arrests actually caused the injuries suffered by Mrs. Brown. That is, the policymaker's (Sheriff Moore's) single action of hiring Burns without an adequate review of his background directly caused the constitutional violations of which Mrs. Brown now complains. *Benavides,* 955 F.2d at 972; *Fraire v. City of Arlington,* 957 F.2d 1268, 1277 (5th Cir.) (section 1983 liability attaches only "where the municipality itself causes the constitutional violation" at issue), *cert. denied,* --- U.S. ----, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992). Therefore, the violation of Mrs. Brown's constitutional rights was affirmatively linked to Bryan County's decision to hire Burns for law enforcement activities. *Stokes v. Bullins,* 844 F.2d 269, 276 (5th Cir.1988).

### B.

Mrs. Brown also contends that Bryan County is liable for inadequately training Burns. The Supreme Court specifically addressed claims for inadequate training in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In reference to these claims, the Court stated that "only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S.Ct. at 1205. It also added the following:

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the

> officer's shortcomings may have resulted from factors other
> than a faulty training program.... Neither will it suffice to
> prove that an injury or accident could have been avoided if an
> officer had had better or more training, sufficient to equip
> him to avoid the particular injury-causing conduct.

*Id.* at 390-91, 109 S.Ct. at 1206 (internal citations omitted). A review of the record reveals that Sheriff Moore had enrolled Burns in the state-mandated Council on Law Enforcement Education and Training (CLEET) program while he worked as a Reserve Deputy.[27] As there is no evidence that Sheriff Moore did anything less than that which is required by law, we do not find the training practices inadequate. *See Benavides v. County of Wilson,* 955 F.2d 968, 973 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992). Although Mrs. Brown's expert urged that additional instructional programs were necessary to supplement the CLEET course and on-the-job training, there is no evidence suggesting that the training standard required by law was inadequate to enable the deputies to deal with "usual and recurring situations" typically faced by peace officers. *Id.* In addition, failure-to-train cases—unlike the negligent-hiring cases—*specifically* require more than a single instance of injury or an isolated case of one poorly trained employee before municipal liability can attach. *See, e.g., Languirand v. Hayden,* 717 F.2d 220 (5th Cir.1983) (holding that, in failure-to-train cases, the plaintiff must establish a *pattern of similar incidents* in which citizens were injured or endangered by intentional or negligent

---

[27]Oklahoma law allows a sheriff to employ reserve deputies during their completion of CLEET. *See* OKLA.STAT.ANN. tit. 19, § 547(B) (West 1994).

31

police misconduct or that *serious incompetence or misbehavior was general or widespread* throughout the police force); *Fraire v. City of Arlington,* 957 F.2d 1268, 1287 (5th Cir.) (holding that, in failure-to-train cases, " "[i]solated violations are not the persistent, often repeated constant violations that constitute custom and policy' "), *cert. denied,* --- U.S. ----, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992); *Rodriguez v. Avita,* 871 F.2d 552 (5th Cir.1989) (discussing *Languirand, supra,* and concluding that municipal liability could not be derived from a single incident of improvident discharge of a firearm by an officer). As Mrs. Brown claims that only Burns was inadequately trained and cites neither to other similar incidents nor widespread misbehavior, her claim alleging inadequate training must fail.

## CONCLUSION

After a thorough review of the record, this Court finds that the evidence supports the jury's verdict holding Burns and Bryan County liable for Mrs. Brown's § 1983 claim based on her false arrest, false imprisonment and the inadequate hiring of Burns. We also find that the district court did not plainly err in dismissing the jury's award for Mrs. Brown's loss of past income and future earning capacity. For these reasons, the jury's verdict stands and the district court's judgment is

AFFIRMED.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

Although I concur in most of the opinion of the Court, I dissent from Part VI of the opinion and the judgment as to Bryan

32

County.   My disagreement is with the majority's treatment of the *Monell*[1] issue—"that a *single incident* of unconstitutional activity will not suffice to hold a municipality liable under *Monell* "*unless* proof of the incident includes proof that it was caused by an existing, *unconstitutional municipal policy,* which policy can be attributed to a municipal policymaker[,]' " maj. op. at 3966 (emphasis added)—which is based on our prior opinion in *Gonzales.*

---

[1]*Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).